No. 92,764

STATE OF KANSAS, *Appellee*, v. MICHAEL TULLY, *Appellant*.

(262 P.3d 314)

Opinion filed September 23, 2011.

*Rebecca L. Kurz*, of Morgan Pilate LLC, of Olathe, argued the cause and was on a brief for appellant, and *Bob L. Thomas*, of the Law Offices of Bob L. Thomas, LLC, of Olathe, was on a brief for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Paul J. Morrison*, former district attorney, *Phill Kline*, former attorney general, *Stephen M. Howe*, district attorney, and *Steve Six*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

LUCKERT, J.: A jury convicted Michael Tully of one count of rape. On direct appeal to the Court of Appeals, Tully argued (1) the State improperly commented on his postarrest silence; (2) the district court gave an improper jury instruction on the element of force; (3) the State's expert witness offered an opinion beyond her qualifications, which also invaded the province of the jury; and (4) cumulative error deprived him of a fair trial. The Court of Appeals majority rejected each of Tully's claims and affirmed his conviction. *State v. Tully*, No. 92,764, 2007 WL 1109309 (Kan. App. 2007) (unpublished opinion). In a dissenting opinion, one member of the Court of Appeals panel found error in the first three issues, which, in his opinion, cumulatively prejudiced Tully and denied him a fair trial. *Tully*, 2007 WL 1109309, at *9-12 (Greene, J., dissenting).

Tully filed a petition for review, raising the same four issues, and this court granted the petition. Under our jurisdiction pursuant to K.S.A. 20-3018(b) and K.S.A. 22-3602(e), we reverse the Court of Appeals and the district court, finding error on each of the first three issues and determining the errors require reversal of his conviction. We remand the matter with directions to the district court.

## FACTS AND PROCEDURAL BACKGROUND

Tully was charged with raping A.C. by engaging in sexual intercourse without her consent under circumstances when she was overcome by force or fear. See K.S.A. 21-3502(a)(1)(A). Tully did not deny having intercourse with A.C. but asserted it was consensual and that A.C. was not overcome by force or fear.

The alleged rape occurred during a party that A.C. and her older sister, J.C., threw while their parents were out of town. A.C. was 14 years old at the time. The girls invited Tully and several other friends to the party. Tully, who had previously dated J.C., was 19 years old at the time. Tully and the other guests spent the night at the girls' home.

During the evening, most of the individuals in attendance became intoxicated, including A.C. At one point, A.C. became so ill she was unable to make it upstairs to the bathroom by herself. Consequently, Tully and A.C.'s boyfriend carried A.C. upstairs. Once they got her into the bathroom, Tully stepped into a hallway where he waited. Tully told A.C.'s boyfriend that he would take care of A.C., and the boyfriend left.

According to A.C., when she stepped out of the bathroom and into the hallway, Tully removed her pants and then carried her into her parents' bedroom and laid her on the bed. Tully told A.C. not to "tell anybody" and then engaged in sexual intercourse with her. A.C. testified that she told Tully "no," and in response he put one of his hands over her mouth and used his other hand to pin down her arm. A.C. stated that she was crying and continued to say "no" and "I don't want to do it." Because of her intoxicated state, A.C. did not try to fight Tully.

After a few minutes, Tully stopped. A.C. then got dressed and went downstairs to her bedroom. A.C. went to the bathroom and noticed she was bleeding a little in the vaginal area. Consistent with this report, the crime investigation detected a blood stain on the bed's cover that matched A.C.'s blood.

According to Tully, he was intoxicated from smoking marijuana and drinking alcohol. When A.C. came out of the bathroom into the hallway after being ill, they began kissing. The kissing progressed to oral sex and eventually to sexual intercourse, all while they were in the hallway. He explained that A.C. told him it hurt, so he stopped. They both walked into a bedroom and started kissing again. They again had sexual intercourse, and "she told me it hurt, so I stopped again." He denied using force and testified that he stopped when she asked him to.

Another of the female party guests, G.N., testified she walked into the bedroom and saw Tully sitting on the bed and A.C. standing nearby. She sat on the bed and visited with them. She testified they "acted like they were flirts." She further explained she felt like she was interrupting something.

Both Tully and J.C. testified that the two of them had had sex earlier at the party. J.C. had stayed in bed. After the sexual en-

counter, Tully left and went downstairs until he helped A.C. back upstairs when she became ill. Tully testified that after he left A.C., he went back into J.C.'s room and got into bed with her. Later, J.C. and Tully again engaged in sexual contact.

There is considerable variation in the testimony of witnesses regarding what happened during the remainder of the night and as various people woke up the next morning. According to A.C.'s testimony, soon after she returned to her own bedroom following the alleged rape, she told her boyfriend she had had "sex" with Tully. She did not use the word "rape," but she made it clear Tully had forced himself on her. She reported to the investigating detective that her boyfriend got upset, confronted Tully, "and they got into a fight over it." Yet, one of the female guests, M.B., testified she went into A.C.'s room early in the morning. A.C. and her boyfriend were asleep, but A.C. woke up. According to M.B., it did not appear A.C. had been crying, and A.C. did not tell her that anything had happened.

J.C.'s version was that when she woke up in the morning, she let the dogs out and then went back to bed, where she and Tully engaged in oral sex. At that point, one of the party guests knocked on J.C.'s door. Tully went into the hallway to see what was going on. When he returned, he reported that A.C.'s boyfriend was saying Tully had "tried to mess around" with A.C. Tully denied any contact with A.C. At that point, J.C. and Tully went downstairs. J.C. testified Tully was impatient to leave and asked J.C., who had driven him to the party, to take him home. J.C. insisted he wait so she could take others home at the same time. Other witnesses also described Tully as being anxious to leave, with one witness describing Tully as being "in a panic."

According to J.C.'s trial testimony, it was only later when J.C. was ready to drive some of the guests home that she noticed one of the female guests, G.N., comforting her sister. She asked what was wrong, and A.C. replied, "Michael and I had sex." J.C. then asked her younger sister whether she had sex or had been raped, and A.C. responded, " 'He raped me.' " A.C. testified to a similar exchange. She stated she first told her sister she and Tully had sex, but when her sister asked if it was sex or rape, A.C. replied it was

rape. A.C. explained she did not initially know the difference between sex and rape.

G.N.'s testimony differed somewhat in that she said she and A.C. were sitting on the downstairs couch when J.C. came downstairs and asked A.C., "Did you have sex with Michael last night?" In reply, A.C. stated that Tully had raped her. Only then did A.C. appear to be upset and begin crying. G.N. also testified about J.C. being upset and yelling. G.N. explained, "I think [J.C.] was pretty grossed out about it because she was with him and, then, you know, then him and her sister and then they [sic] got back with [J.C.] again."

Everyone agrees that J.C. confronted Tully and accused him of raping her sister. There are varying accounts regarding what Tully said in reply, however. According to J.C.'s trial testimony, Tully responded, " 'Yeah, I did, and I'm sorry." But J.C.'s testimony on this point was inconsistent with what she told the investigating detective. The detective testified J.C. informed him that when J.C. confronted Tully about the incident, Tully admitted having sex with A.C. but said that when A.C. asked him to stop, he did. A.C. testified Tully initially denied anything had happened, but when her sister kept yelling at him, he said, " 'I did not mean for it to happen' and for her not be mad at him." G.N. testified J.C. started yelling at Tully. Tully initially denied raping A.C. but eventually admitted to the rape. According to G.N., J.C. asked Tully, " 'How could you rape her? How could [you] do this to her?" Tully responded, " 'Yes. I'm sorry; I did it, but there is nothing I could do to take it back.' " G.N. also testified Tully never claimed the encounter had been consensual.

Another friend of the girls, M.B., testified Tully never expressly used the words " 'Yeah, I raped her.' " Instead she recalled Tully having said, " 'I'm sorry, I'm sorry, I think I did something wrong. I'm sorry.' " She also testified he said, "I think I made a mistake." Nonetheless, M.B. testified that in the context of the conversation it appeared to her Tully was admitting to having used force on A.C.

For his part, Tully denied to the jury that he ever admitted to raping A.C. He explained he did apologize because he knew A.C. was a minor and it was "wrong" to have sex with her. At several

points, he explained to the jury he thought he had done something "wrong" by having sex with a 14 year old. He insisted the sex was consensual and he stopped as soon as A.C. said it was hurting her. He denied using force or doing anything to scare A.C.

After the party, A.C. decided she did not want to tell anyone about what had happened. J.C. acquiesced in this decision, and the girls did not attend work or school for a few days. Five days after the incident, J.C. told a friend what had happened and purposefully did so loud enough for a nearby teacher to overhear. The teacher reported the conversation to school officials who, in turn, reported the incident to law enforcement officials. A.C. was taken to the hospital for an examination, where she reported burning and discomfort to the emergency room doctor. The pelvic exam revealed no signs of physical trauma.

At the close of the State's evidence and again at the close of all the evidence, Tully moved for judgment of acquittal. The district court denied both motions. The jury convicted Tully of one count of rape. The court denied Tully's motion for new trial and sentenced him to 203 months' imprisonment.

As previously noted, Tully appealed, and the Court of Appeals, in a 2-1 decision, affirmed his conviction and sentence. *Tully*, 2007 WL 1109309, at *8-9.

## ANALYSIS

ISSUE 1: *Did the State improperly cross-examine Tully on postarrest silence?*

In his first issue on appeal, Tully contends the State violated *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), during cross-examination by eliciting evidence that Tully invoked his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, *reh. denied* 385 U.S. 890 (1966). The State counters that (1) there was no *Doyle* violation because there is no evidence that Tully received *Miranda* warnings and (2) Tully opened the door on direct examination by implying that he was cooperative during the investigation.

## Challenged Testimony

These arguments relate to the following exchange during the State's cross-examination of Tully:

"Q. [State] And you testified towards the end of your direct examination that you submitted to DNA, but that also was months and months after this investigation, is that correct?
"A. [Tully] Probably a month or two ago.
"Q. And you're not trying to suggest to the members of this jury that you were all cooperative or anything, were you?
"A. I was cooperative.
"Q. Much later in the investigation, though; correct?
"A. I would have been cooperative if they would have asked before that.
"Q. Okay."

After this line of questioning, the State requested a bench conference. The State argued, "Judge, this is what I was afraid of from direct. I know that the police contacted Mr. Tully, and Mr. Tully didn't go in and talk to the police, so I think the door is open."

Apparently, the State was referring to the following testimony during Tully's direct examination:

"Q. [Defense Counsel] Did you allow yourself to be—a sample of DNA to be collected from you?
"A. [Tully] Yes, sir.
"Q. When did you hear about this crime again? When did you hear about the crime against you?
"A. A few days later.
"Q. What did you do?
"A. I eventually turned myself in, but that was months later when I turned myself in, I guess, a warrant was issued."

Also, during opening statements, defense counsel told the jurors that they would "hear evidence that shortly thereafter Mike Tully surrendered himself to the police."

In responding to the State's argument that these exchanges opened the door for the State to be able to introduce evidence that Tully had asserted his right to remain silent, defense counsel stated:

"[Defense counsel]: Judge, whether or not he submitted to [a] DNA sample is a far cry from whether or not he asserts his right to remain silent. Two separate issues. I don't believe the door has been opened for him to now comment on his right to remain silent.

"I would object to any further questions along the line of his right to remain silent or his assertion of his right to remain silent.

"[State]: Judge, if the information is there in opening statement that he was cooperative and this situation was there towards the end of that thing is cooperating and that's what he said.

"THE COURT: The door is open. He has given the jury fully the impression. If the State has evidence to the contrary to show, [it] may present it.

"[Defense counsel]: For the purpose of appeal, I don't think the State can intentionally open the door and then argue that he invoked the right to remain silent. I disagree.

"THE COURT: I think on direct examination he alluded to the fact that he was somewhat cooperative. I believe the door was opened then on direct."

Testimony then resumed, and the State asked Tully the question that is at the heart of this issue:

"Q. [State] Mr. Tully, the fact of the matter is, shortly after this incident took place, you did assert your right to remain silent, didn't you?
"A. Yes, sir."

This final question clearly presented evidence that Tully asserted his right to remain silent. The issue we must resolve is whether the admission of this evidence violated Tully's constitutional rights.

*Standard of Review*

A multistep standard is applied to the review of evidentiary rulings. *State v. Shadden*, 290 Kan. 803, 817, 235 P.3d 436 (2010). Under this multistep analysis, the first question is relevance. *Shadden*, 290 Kan. at 817. The Court of Appeals found Tully's postarrest silence relevant to show the degree of his cooperation with police. *Tully*, 2007 WL 1109309, at *1. The parties do not dispute the relevance of the challenged testimony.

Second, it must be determined which rules of evidence or other legal principles apply. This conclusion is reviewed de novo. *Shadden*, 290 Kan. at 817. Here, there is a dispute as to which legal principles apply. Tully argues the issue is whether there was a violation of his constitutional rights, but the State argues the record does not establish that any constitutional right was implicated and, consequently, the applicable legal principles relate to the permissible scope of cross-examination.

In the third step, the district court must apply the applicable rule or principle. The appellate court's review of this third step varies depending on the rule the district court applied. *Shadden*, 290 Kan. at 817. The determination of whether the admission of evidence violated Tully's constitutional rights raises a question that is reviewed de novo. *State v. Murray*, 285 Kan. 503, 520, 174 P.3d 407 (2008). If constitutional rights are not implicated, the propriety and scope of cross-examination lies within the district court's discretion and is reviewed on appeal for an abuse of discretion. *State v. Sharp*, 289 Kan. 72, 97, 210 P.3d 590 (2009). Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the district court; (2) is based on an error of law, *i.e.*, if the court's discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

*Pre- or Post-*Miranda?

The resolution of the second and third step of this analysis is dependent, therefore, on whether Tully's constitutional rights as protected by *Doyle* are implicated. The State argues *Doyle* is not implicated because Tully did not establish that he asserted his right to remain silent after he had been *Mirandized*. This sequential, temporal relationship between the reading of the *Miranda* warnings and the assertion of the right to remain silent is critical because the *Doyle* Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and *after* receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." (Emphasis added.) *Doyle*, 426 U.S. at 619; see *State v. Mims*, 220 Kan. 726, Syl. ¶ 1, 556 P.2d 387 (1976).

This court has explained the rationale for this limitation by stating: "*Doyle* and its progeny did not provide unlimited protection to the criminal defendant who testifies in his own behalf; rather, they stand for the principle that a defendant's silence *induced by government action* cannot be used to impeach his credibility. [Ci-

tations omitted.]" *State v. Massey*, 247 Kan. 79, 82, 795 P.2d 344 (1990); see *State v. Hernandez*, 284 Kan. 74, 82-83, 159 P.3d 950 (2007). This inducement comes in the form of the *Miranda* warnings, which "imply that a person's invocation of his or her right to silence will carry no penalty," and because the exercise of the right to silence has been induced by that implication; thus "a later breach of that bargain at trial offends due process." *State v. Wilkerson*, 278 Kan. 147, 157, 91 P.3d 1181 (2004).

There are limitations to the application of *Doyle*'s protections even if the defendant asserted the right to remain silent *after* being *Mirandized*. In *Doyle*, the Supreme Court noted its holding would not prohibit prosecutors from commenting on a defendant's post-*Miranda* silence for *all* purposes. The Court provided a specific example, indicating post-arrest silence can be used by the prosecutor to contradict a defendant who testified to an exculpatory version of events and claims to have told law enforcement officers the same version upon arrest. "In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest." *Doyle*, 426 U.S. at 620 n.11; see *Murray*, 285 Kan. at 522-26; *State v. Gadelkarim*, 256 Kan. 671, 685-86, 887 P.2d 88 (1994), *disapproved on other grounds by State v. Gunby*, 282 Kan. 39, 61-62, 144 P.3d 647 (2006) (disapproving of res gestae as an independent basis of admission of evidence); *State v. Falke*, 237 Kan. 668, 682, 703 P.2d 1362 (1985), *disapproved on other grounds by State v. Walker*, 252 Kan. 279, 297-98, 845 P.2d 1 (1993) (disapproving of voluntary intoxication instruction language).

Based on this statement in *Doyle*, courts have allowed a prosecutor to impeach a defendant who argues he or she cooperated with an investigation, in other words, one who "opens the door." As one court stated: " 'When a defendant attempts to convince a jury that he was of a cooperative spirit, *Doyle* does not tie the hands of prosecutors who attempt to rebut this presentation by pointing to a lack of cooperation.' [Citation omitted.]" *United States v. O'Keefe*, 461 F.3d 1338, 1348 (11th Cir. 2006); see also *Earnest v. Dorsey*, 87 F.3d 1123, 1135 (10th Cir. 1996) (reference to post-

arrest silence allowed but only to rebut defendant's implication that he cooperated with police); *McMillan v. Gomez*, 19 F.3d 465, 469-70 (9th Cir. 1994) (ruling it was proper for counsel to refute defendant's impression of cooperation with police with evidence of noncooperation). On the other hand, this court has warned that this exception " 'cannot be used as a pretext for the violation of a defendant's constitutional rights where there is no justification for doing so.' [Citations omitted.]." *Murray*, 285 Kan. at 522; see also *United States v. Gant*, 17 F.3d 935, 941-43 (7th Cir. 1994) (government crossed the fine line between impeachment and inference of guilt, but error harmless); *United States v. Shue*, 766 F.2d 1122, 1130 (7th Cir. 1985) (holding government went too far and implied defendant's silence was inconsistent with claim of innocence).

There is an additional limitation on the holding in *Doyle*: *Doyle* does not prohibit a prosecutor from impeaching a defendant at trial based on his or her prearrest and pre-*Miranda* silence. *Fletcher v. Weir*, 455 U.S. 603, 607, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982); *Jenkins v. Anderson*, 447 U.S. 231, 240, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980); *Hernandez*, 284 Kan. at 82-83; *State v. Haddock*, 257 Kan. 964, 972, 897 P.2d 152 (1995), *overruled on other grounds by State v. James*, 276 Kan. 737, 79 P.3d 169 (2003) (clarifying standard of review for determination of whether a defendant was in custody).

As previously noted, on appeal the State points to both of these limitations by arguing Tully has not shown he had been *Mirandized* before he asserted his right to remain silent and Tully opened the door by claiming cooperative behavior.

*Insufficient Proof of Arrest and* Miranda *Warnings*

The Court of Appeals majority resolved the first prong of this argument—that Tully failed to establish that he had been *Mirandized* before he exercised his right to remain silent—by concluding: "Tully *admits* there was no evidence that he was given *Miranda* warnings." (Emphasis added.) *State v. Tully*, No. 92,764, 2007 WL 1109309, at *4 (Kan. App. 2007) (unpublished opinion). The basis for this conclusion is unclear, however. Before us, Tully protests he never made that admission. Rather, he argued before the Court

of Appeals and now argues before this court that the record establishes he exercised his right to remain silent after being given *Miranda* warnings.

To support this assertion, Tully relies on two statements in the record on appeal. In the first, the prosecutor objected to the admission of a police report on the grounds the report contained information about "contact with Tully where Tully *invoked his right to remain silent*." (Emphasis added.) The second statement occurred during the cross-examination of Tully. The State was inquiring about Tully's cooperation with the investigation when the prosecutor asked Tully, "Mr. Tully, the fact of the matter is, shortly after this incident took place, you did *assert your right to remain silent*, didn't you?" Tully responded, "Yes, sir."

Tully asserts these two references demonstrate that the prosecutor was referring to post-*Miranda* silence because both instances include the phrase "right to remain silent." This argument is notably similar to an inference this court drew in *Murray*, 285 Kan. at 519, where a witness indicated that " '[o]n advice of counsel [the defendant] was no longer available to be reinterviewed.' " The *Murray* court said the statement implicated the defendant's rights under *Doyle* because it "explicitly refers to the defendant's invocation of his right to silence." *Murray*, 285 Kan. at 521. However, in *Murray* it was clear from other parts of the record that the defendant had been advised of his *Miranda* rights. In contrast, the timing is not clear in this case and, as the State argues, "One can invoke a right to remain silent without having been read *Miranda* rights."

Generally, a *Miranda/Doyle* constitutional argument is defeated by the failure to establish that *Miranda* warnings have been given, meaning the *Doyle* protections do not apply. See, *e.g.*, *Hernandez*, 284 Kan. at 88-92 (concluding *Doyle* violation not established when prosecutor's question was unclear regarding whether referring to pre- or post-*Miranda* silence); *Wilkerson*, 278 Kan. at 157 (noting record did not establish whether person was in custody or had received *Miranda* warnings before refusing to talk to investigators); *State v. Carter*, 30 Kan. App. 2d 1247, 1250-51, 57 P.3d 825 (2002), *rev. denied* 275 Kan. 966 (2003) (rejecting allegation of a *Doyle*

violation because defendant failed to refer to any portion of the record indicating he had received *Miranda* warnings); see also *Fletcher*, 455 U.S. at 605 (distinguishing *Doyle* because record did not establish defendant "received any *Miranda* warnings during the period in which he remained silent"); *Mattox v. State*, 196 Ga. App. 64, 65, 395 S.E.2d 288 (1990) (relying on *Fletcher* to hold defendant has burden to establish right to remain silent was asserted post-*Miranda*); *Lainhart v. State*, 916 N.E.2d 924, 936 (Ind. App. 2009) (same); *State v. McGinnis*, 70 N.C. App. 421, 423-24, 320 S.E.2d 297 (1984) (same); *State v. Cummings*, 779 S.W.2d 10, 12 (Mo. App. 1989) (same); *Royal v. State*, 761 P.2d 497, 500 (Okla. Crim. 1988) (same); 3 LaFave, Criminal Procedure § 9.6(a), p. 497 n.47 (3d ed. 2007) (where a defendant asserts a *Doyle* violation, the defendant "ordinarily bears the burden of showing that *Miranda* warnings were given prior to the post-arrest silence used by the State for impeachment purposes").

Nevertheless, as the Ninth and Third Circuit Courts of Appeal have held, a party seeking to admit evidence that a witness asserted the right to remain silent must lay a foundation for the admission of the evidence and in doing so has the burden to establish there is no *Doyle* violation. *United States v. Foster*, 995 F.2d 882, 883 (9th Cir. 1993); *United States v. Cummiskey*, 728 F.2d 200, 206 (3d Cir. 1984). In this case, defense counsel preserved this point by objecting that the State's questions were "along the line of [Tully's] right to remain silent or his assertion of his right to remain silent." While the objection did not mention *Doyle*, *Miranda*, or any constitutional provision, it was specific in mentioning the implicated constitutional right, *i.e.*, the right to remain silent. See K.S.A 60-404 (contemporaneous objection required); *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009) (objection to evidence must be contemporaneous and specific).

In response, the State did not assert it had an unlimited right to admit the evidence of Tully's silence because *Miranda/Doyle* protections had not attached. Rather, the State asked the district court to base its ruling on a determination that the defense had opened the door. The clear implication of this argument is that *Miranda/Doyle* protections apply and the evidence is only admissible if the

defendant opened the door to such testimony. The State, thus, invited the defendant and the district court to forego the opportunity to clarify the record regarding whether *Miranda* warnings had been given and whether *Doyle* applied. This action, while not the same as invited error or a failure to make a contemporaneous objection, is an analog to those doctrines. *Cf. State v. McCaslin,* 291 Kan. 697, Syl. ¶ 4, 245 P.3d 1030 (2011) (purpose of the contemporaneous objection rule is "to avoid the use of tainted evidence and thereby avoid possible reversal and a new trial."); *Murray,* 285 Kan. at 522 ("A litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal."). Consequently, under the procedural circumstances of this case, we conclude the State waived its right to assert on appeal that *Doyle* does not apply. As a result, we will treat the issue in the manner it was preserved for appeal and determine if the defendant opened the door to this evidence.

*Did Tully's Testimony on Direct Examination Open the Door?*

Tully maintains that "[t]he defense did not say that Tully was cooperative." According to Tully, the prosecutor baited Tully into professing cooperation as a "ploy . . . to put otherwise inadmissible evidence before the jury." The State counters that while defense counsel did not use the specific word "cooperate" in opening statement or in direct examination of Tully, defense counsel opened the door by implying Tully was cooperative with police during the investigation. Because we are treating this issue in the way it was preserved, as a constitutional issue, we review this question de novo. See *Murray,* 285 Kan. at 520.

If we were to view defense counsel's statement or questions on direct examination in isolation, we would conclude the defense had opened the door. But counsel's statement and questions do not determine the issue. Rather, the evidence, *i.e.,* the defendant's response to the question, is determinative. When we focus on the evidence, there is no indication Tully was invoking or implying a "cooperative spirit." Tully merely testified he "eventually" turned himself in. Plus, on cross-examination it was made even clearer that Tully made no attempt to assist the investigation. Specifically,

when Tully testified about turning himself in, he clarified "that was months later when I turned myself in, I guess, a warrant was issued." Moreover, when asked about the DNA sample on cross-examination, Tully explained the sample was provided just a month or so before trial; he responded affirmatively to the prosecutor's suggestion that this was months and months after the investigation. By that point, which was before the question about Tully asserting the right to remain silent and the district court's ruling that the question would be allowed, Tully had erased any impression he had cooperated with the investigation.

As this court has previously emphasized, even if a defendant cracks open a door, that opening may not be used to excuse the actions by a prosecutor during cross-examination or closing argument when such actions are ordinarily improper, erroneous, and are not a necessary or justified response to the actions of the other party in order to achieve a fair trial. *State v. Higgins*, 243 Kan. 48, 51-52, 755 P.2d 12 (1988), *disapproved on other grounds by State v. Warren*, 252 Kan. 169, 178, 843 P.2d 224 (1992) (rejecting the *Higgins* court's multiplicity analysis); see *Murray*, 285 Kan. at 525. Here, the defense only opened the door regarding the defendant's behavior after the warrant had issued, and Tully's testimony made that clear; the impeachment was not necessary or justified.

We emphasize the importance of respecting the protections of *Doyle* because, as the United States Supreme Court has stated: "[E]very post-arrest silence is insolubly ambiguous." *Doyle*, 426 U.S. at 617. To explain this statement, the *Doyle* Court pointed to its earlier decision of *United States v. Hale*, 422 U.S. 171, 176, 95 S. Ct. 2133, 45 L. Ed. 2d 99 (1975), where the Court concluded that "silence is so ambiguous that it is of little probative value." For example, the *Hale* Court noted: "[I]nnocent and guilty alike— perhaps particularly the innocent—may find the situation so intimidating that they may choose to stand mute." *Hale*, 422 U.S. at 177. Emotion, confusion, lack of understanding, and multiple other reasons may explain the silence. Consequently, the Court held: "Not only is evidence of silence at the time of arrest generally not very probative of a defendant's credibility, but it also has a significant potential for prejudice. The danger is that the jury is likely to assign

much more weight to the defendant's previous silence than is warranted." *Hale*, 422 U.S. at 180. As a result, before a defendant's postarrest, post-*Miranda* silence is admissible, "[i]t must appear to be an act blatantly inconsistent with the defendant's trial testimony." *United States v. Fairchild*, 505 F.2d 1378, 1382 (5th Cir. 1975).

Here, Tully's silence was not blatantly inconsistent with his trial testimony. Any narrow opening left by Tully, *i.e.,* that he cooperated after the investigation was complete and a warrant had issued, did not give the State permission to swing wide the door and talk about Tully's behavior before that point. As Judge Greene noted in his dissent from the Court of Appeals decision, it was not until cross-examination by the State that the door was fully opened by Tully's claim to be "cooperative," and that claim was in response to the State's question: "And you're not trying to suggest to the members of this jury that you were all cooperative or anything, were you?" In addition, Tully's claim that he "would have been cooperative if they [the investigators] would have asked before that" was in response to the State's question, "[You were cooperative] [m]uch later in the investigation, though; correct?" Judge Greene concluded the prosecutor "baited" Tully into claiming he was cooperative and the district court "mistakenly" concluded this line of testimony on cross-examination "had opened the door to permit intrusion into Tully's post-arrest silence." *Tully*, 2007 WL 1109309, at *9 (Greene, J., dissenting).

We agree and conclude Tully's rights as protected by *Miranda* and *Doyle* were violated by the State's questions. Consequently, we must consider whether this error was harmless.

*Harmless Error*

We recently clarified that under the harmless error standards of K.S.A. 60-261, K.S.A. 60-2105, and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), the test is whether an error affected substantial rights, meaning whether the error affected the outcome of the trial. See *Ward*, 292 Kan. 541, Syl. ¶¶ 5-6. As we stated in *Ward*:

"The degree of certainty by which the court must be persuaded that the error did not affect the outcome of the trial will vary depending on whether the error infringes upon a right guaranteed by the United States Constitution. If it does not, the . . . court should apply K.S.A. 60-261 and determine if there is a reasonable probability that the error did or will affect the outcome of the trial in light of the entire record. If the fundamental failure infringes upon a right guaranteed by the United States Constitution, the . . . court should apply the constitutional harmless error standard defined in *Chapman*, in which case the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *Ward*, 292 Kan. at 541, Syl. ¶ 6.

An appellate court examines the error in the context of the record as a whole, see *Ward*, 292 Kan. 541, Syl. ¶ 6, considering how the district court dealt with the error as it arose (including the efficacy, or lack of efficacy, of any remedial efforts), see *Ward*, 292 Kan. at 569-70. Here, the district court took no remedial action, and the issue was one that impacted Tully's credibility. Under the facts of this case, the verdict rested on whether the jury believed Tully's testimony that the sex between him and A.C. was consensual or A.C.'s testimony that the sex was nonconsensual and forced by Tully holding a hand over her mouth and pinning down her arm. Consequently, any error that impacted Tully's credibility had a reasonable possibility of contributing to the verdict and cannot be declared harmless.

We will still discuss the other claimed errors to provide guidance on remand, and, in addition, because we find additional error, we will note how this contributes to our conclusion that Tully's conviction must be reversed.

ISSUE 2: *Did the district court's jury instruction on the force necessary to prove rape amount to clear error?*

Next, Tully challenges Jury Instruction No. 11, a non-PIK instruction that was provided to the jury at the State's request in order to explain the level of force required for rape.

Jury Instruction No. 11 provided:

"The 'force' required to prove a rape claim does not require that the victim resist her assailant to the point of becoming the victim of a battery or aggravated assault;

[t]he victim need not be physically overcome by force in the form of a beating or physical restraint."

Defense counsel objected to Instruction No. 11 "because it is not a standard instruction, it is not a PIK instruction, it invades the province of the jury . . . [and] although it is a correct statement of the law, it is inappropriate to provide to the jury." The district court held that Instruction No. 11 should be submitted to the jury because the court had a duty to correctly state the law and the instruction was necessary to clarify the term " 'force' " because of disputed testimony concerning whether Tully placed his hand over A.C.'s mouth and pinned her down.

A majority of the Court of Appeals agreed with the district court and rejected Tully's challenge to the instruction, stating:

"Instruction No. 11 correctly stated the law as applied to the facts of this case because there was a dispute about Tully physically forcing A.C. to engage in sexual intercourse because there [were] no signs of physical trauma. The instruction could not have misled the jury given the facts of the case." *Tully*, 2007 WL 1109309, at *6.

In dissent, Judge Greene found the instruction to be confusing and misleading because it did not include a "final affirmative statement to remind the jury that being overcome remains critical to guilt despite no evidence of beating or physical restraint" and because it did not define "legal terms of art." *Tully*, 2007 WL 1109309, at *10-11 (Greene, J., dissenting).

*Standard of Review and Parties' Arguments*

The parties disagree on the standard of review to be applied to this issue. Tully objected to Instruction No. 11 at trial and, thus, maintains the following standard of review should apply: Even if erroneous in some way, instructions do not constitute reversible error if they properly and fairly state the law as applied to the facts of the case and could not reasonably mislead the jury. *State v. Makthepharak*, 276 Kan. 563, 568-69, 78 P.3d 412 (2003). The Court of Appeals applied this standard of review. *Tully*, 2007 WL 1109309, at *5 (citing *State v. Edgar*, 281 Kan. 47, 54, 127 P.3d 1016 [2006]).

The State, on the other hand, contends Tully has changed his arguments on appeal and, consequently, under the holding in *State v. Ellmaker*, 289 Kan. 1132, 1139-40, 221 P.3d 1105 (2009), *cert. denied* 130 S. Ct. 3410 (2010), the standard of review is whether the instruction is clearly erroneous. See K.S.A. 22-3414(3). In *Ellmaker*, this court explained the purpose of an objection is to allow the district court the opportunity to correct any error. Consequently, a clearly erroneous standard of review should be applied when the trial objection to a jury instruction differs from the argument raised on appeal. *Ellmaker*, 289 Kan. at 1139. Instructions are clearly erroneous only if the reviewing court is firmly convinced that the jury would have reached a different verdict had the error not occurred. *State v. Colston*, 290 Kan. 952, 969, 235 P.3d 1234 (2010).

Before this court, Tully essentially asserts four reasons for finding the instruction erroneous, as compared to the two he asserted before the district court. As to the objections he raised at trial, Tully briefly mentions the instruction was not a PIK instruction. He stresses the other argument raised before the district court: The instruction invades the province of the jury by erroneously implying that the lack of a beating or physical restraint should not be considered. He argues negative evidence of physical injuries is a valid fact for a jury to consider in determining whether a victim was overcome by force. Our standard of review related to these two arguments is whether the jury instruction properly stated the law and whether the instruction could reasonably have misled the jury. *Makthepharak*, 276 Kan. at 568-69.

The two additional reasons Tully argues are ones he raises for the first time on appeal and are ones he adopts from Judge Greene's dissenting opinion: (1) The instruction was misleading because it did not use the complete definition of "force" discussed in *State v. Borthwick*, 255 Kan. 899, 914, 880 P.2d 1261 (1994), and (2) the instruction could have confused the jury because the legal terms "battery" and "aggravated assault" were not defined. Because Tully did not raise these concerns before the district court, the clearly erroneous standard must apply to these claims.

*Error?*

Tully's first claim of error is that Jury Instruction No. 11 was not a PIK instruction. Use of PIK instructions is not required but is strongly recommended. " ' " 'If the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed.' " ' [Citations omitted.]" *State v. Dixon*, 289 Kan. 46, 67, 209 P.3d 675 (2009). When a district court ventures from the standard language of a pattern instruction, the court runs the risk of including or omitting words that are essential to a clear statement of the law. Tully asserts this occurred with Instruction No. 11 in that essential words were omitted.

The language for Instruction No. 11 was taken from *Borthwick*, 255 Kan. at 914, but is not identical to the language used in that decision. In Borthwick, this court considered whether there was sufficient evidence to support the defendant's conviction of rape by force or fear. The victim suffered from extreme mobility disabilities; she could not walk without assistance or stand without support. She alleged the defendant sat behind her and began touching her against her will and then laid her on the floor and removed her shorts and underpants. She testified she tried to keep her legs together " 'but they always came apart' "; otherwise she felt helpless to stop what was happening, and she was afraid. Borthwick, 255 Kan. at 902-03. The defendant pointed to cases where victims were threatened with a gun, struck repeatedly, choked, stomped, tied up, or otherwise attacked with great violence or life-threatening actions. Because such conditions did not exist in *Borthwick*, where the alleged force was laying the victim down and pushing her legs apart, the defendant argued there was not sufficient evidence of force or fear. This court rejected that argument. *Borthwick*, 255 Kan. at 911-12.

In its syllabus, the court explained the "force" requirement under K.S.A. 21-3502(a)(1)(A) by stating:

"The force required to sustain a rape conviction in Kansas does not require that a rape victim resist her assailant to the point of becoming the victim of other

crimes such as battery or aggravated assault. Kansas law does not require that a rape victim be physically overcome by force in the form of a beating or physical restraint *in addition to forced sexual intercourse.* Kansas law requires a showing that the victim did not consent to the sexual intercourse and that she was overcome by force or fear to facilitate the sexual intercourse." (Emphasis added.) *Borthwick,* 255 Kan. 899, Syl. ¶ 7.

In the body of the opinion, the *Borthwick* court used slightly different language:

"The 'force' required to sustain a rape conviction in this state does not require that a rape victim resist to the point of becoming the victim of other crimes such as battery or aggravated assault. K.S.A. 21-3502 does not require the State to prove that a rape victim told the offender she did not consent, physically resisted the offender, and then endured sexual intercourse against her will. It does not require that a victim be physically overcome by force in the form of a beating or physical restraint. It requires only a finding that she did not give her consent and that the victim was overcome by force or fear to facilitate the sexual intercourse." (Emphasis added.) *Borthwick,* 255 Kan. at 914.

The words we emphasized in these quotations were omitted from Instruction No. 11.

The *Borthwick* court, although in the context of discussing fear, emphasized that the question of whether a victim is overcome is one of fact for the jury to decide. *Borthwick,* 255 Kan. 899, Syl. ¶ 6. Citing *Borthwick,* this court subsequently recognized that force or fear within the definition of rape is a highly subjective concept that does not lend itself to definition as a matter of law. *State v. Chaney,* 269 Kan. 10, 20, 5 P.3d 492 (2000) (considering incapacity to consent). Further, the *Chaney* court noted the *Borthwick* court "declined to define in absolute terms the degree of force required to sustain a rape conviction." *Chaney,* 269 Kan. at 20. Rather, as the *Chaney* court noted and found significant, the *Borthwick* court used examples from other cases to explain that the evidence could support a rape conviction even if there was no evidence of a beating. See *Chaney,* 269 Kan. at 20; *Borthwick,* 255 Kan. at 909-11, 913-14. Hence, the district court in this case used the *Borthwick* decision to do what the *Borthwick* court declined to do, *i.e.,* define the force or fear necessary for a victim to be "overcome."

Notably, the PIK Committee did not incorporate the language from *Borthwick* into a pattern instruction even though it cited

*Borthwick* in its comments to PIK Crim. 3d 57.01. In that discussion, the Committee included the "in addition to forced sexual intercourse" language from *Borthwick*, 255 Kan. 899, Syl. ¶ 7, which was omitted from Instruction No. 11. See PIK Crim. 3d 57.01, comment. Additionally, as Judge Greene noted, the fact the Committee considered the *Borthwick* decision but did not include the language in a jury instruction suggests an instruction like Instruction No. 11 is not necessary. *State v. Tully*, No. 92,764, 2007 WL 1109309, at *10 (Greene, J., dissenting). Indeed, the facts of this case are not so peculiar as to require special instructions.

Tully's second claim of error is that Instruction No. 11 improperly suggested the jury should not consider a lack of a beating or physical restraint. The instruction does not explicitly give this direction. Nevertheless, the instruction allows a juror to draw the negative inference that a lack of injury does not indicate a lack of force.

This negative implication is strengthened because, as Tully asserts in his third claim, Instruction No. 11 varies from the wording of the *Borthwick* decision in a critical aspect regarding the need to establish that the victim was overcome by force or fear. As Judge Greene aptly noted, what is missing from Instruction No. 11 is the final affirmative statement in *Borthwick* that would "remind the jury that being overcome remains critical to guilt despite no evidence of beating or physical restraint." *Tully*, 2007 WL 1109309, at *11 (Greene, J., dissenting). Because of this omission, the instruction was not a full statement of the law and, contrary to the conclusion of the Court of Appeals majority, was therefore not accurate and could have misled the jury.

The State suggests this omission was cured by a separate instruction which defined the elements of rape by correctly stating that the sexual intercourse must have been committed without A.C.'s consent "under circumstances when she was overcome by force or fear." Reading the instructions as a whole, the State argues, fills in the gap. This is true, so long as the differences in the two instructions are not confusing and misleading. Here, the difference is confusing, primarily because Instruction No. 11 was apparently intended to define the level of force necessary, *i.e.*, it was the more

specific instruction, yet it omitted the language emphasizing that some amount of force must still be proven even if it does not rise to the level of a battery or an aggravated assault.

Finally, as to Tully's fourth claim of error, we agree with Judge Greene and Tully that confusion also results from the lack of any explanation regarding what the *Borthwick* court meant when it used the terms "battery" and "aggravated assault" in the context of stating a victim of rape did not have to resist her assailant to the point of becoming the victim of other crimes such as battery. Judge Greene expressed concern that a lay juror would not understand these legal terms because the terms were not defined. *Tully*, 2007 WL 1109309, at *10-11. Definitions of the terms would not have alleviated the confusion, however. The *Borthwick* court seemed to mean what it later said—a victim need not resist rape to the point of being beaten. But a battery can occur without a beating. In fact, as the *Borthwick* court had explained, a sexual battery can occur without force or fear. Because of that distinction, the *Borthwick* court concluded the incident in that case was not "merely a sexual battery." *Borthwick*, 255 Kan. at 913. Inserting the term battery, even if defined, would confuse the elements of rape.

In sum, we conclude Instruction No. 11 was erroneous due to the omission of the key language on the element of force and the confusing terminology that was used. We further conclude the instruction could have confused the jury and caused it to overlook the requirement that A.C. must have been overcome by force or fear. This is especially concerning given there were no physical injuries to A.C. and the issue of whether Tully forced A.C. to engage in sexual intercourse was the main debate at trial.

Consequently, on retrial Instruction No. 11 or any similar instruction should not be used. Moreover, even though we found the first issue to be reversible, we also determine Instruction No. 11 was clearly erroneous. We conclude there was a real possibility that the jury would have rendered a different verdict if the error had not occurred. See *Ellmaker*, 289 Kan. at 1139-40.

ISSUE 3: *Did the district court abuse its discretion by allowing an emergency room doctor's expert testimony on the lack of physical trauma?*

In his third claim of error, Tully argues an emergency room doctor, Hillary Park Hofman, M.D., was not qualified by special knowledge, skill, training, or experience to testify regarding whether the lack of physical injury meant A.C. was not raped. Tully further argues this testimony was inadmissible because it allowed the State to present an expert's opinion on an ultimate issue.

In response, the State complains Tully is switching his position because, before the Court of Appeals, he argued an emergency room doctor can be allowed to testify concerning the lack of physical evidence in a rape case. The State further asserts Tully did not object at trial to the question: "Does that necessarily mean that this girl was not raped?" Finally, the State maintains that Dr. Hofman was "qualified to impart to the jury knowledge within the scope of her special skill and experience" and she did not render an opinion concerning whether A.C. had been raped.

*Standard of Review*

As set forth in Issue I, this court applies a multistep analysis to reviews of the district court's admission or exclusion of evidence. Here, the first step—relevance—is not contested by the parties as the presence of force was highly contested at trial. As to the second step, the parties generally agree that the applicable rule is K.S.A. 60-456(b), which governs the admission of expert testimony. Under the third step, a district court's application of K.S.A. 60-456 is reviewed on appeal for an abuse of discretion. *State v. Shadden*, 290 Kan. 803, 817, 235 P.3d 436 (2010); see *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011) (stating three-part abuse of discretion test).

*Dr. Hofman's Testimony*

Dr. Hofman was the emergency room doctor who examined A.C. 5 days after the incident. As background information, she testified she had been a doctor for 5½ years and had practiced emergency medicine for 4½ years, during which she had treated "[h]undreds" of trauma victims' injuries. Regarding her treatment of A.C., Dr. Hofman explained she first obtained A.C.'s account of being raped and then performed a standard pelvic examination.

Dr. Hofman testified the examination revealed no evidence of any bruising, lesions, or lacerations along A.C.'s vaginal wall.

The State then asked Dr. Hofman, "Does negative results carry any connotation with regard to whether or not [A.C.] was raped?" Defense counsel immediately objected, stating, "Speculative. I don't think this witness is qualified as an expert along those lines." The district court overruled the objection, and the State continued its questioning:

"Q. [State:] Negative results for bruising, lesions, and lacerations?
"A. [Dr. Hofman:] Uh-huh.
"Q. Does that necessarily mean that this girl was not raped?
"A. No.
"Q. Do you expect to see trauma when you look at rape victims?
"A. Depends on the amount of force that was used, and it also depends on the timing from the event.
. . . .
"Q. Can there be injury without visible trauma?
"A. Yes.
"Q. Could you explain that, please.
"A. Well, my understanding is that rape is also kind of a legal term.
"Q. Right.
"A. And so someone could penetrate the vagina and there would be no physical findings and . . . yet a rape could have occurred."

As this indicates, defense counsel objected to the first question and, after the district court overruled the objection, did not renew the objection to what was essentially the same question. The objection was sufficient to preserve this issue for appeal.

*Abuse of Discretion*

As we consider the arguments, we first note that the basis of the State's complaint regarding shifting arguments is unclear. Before the Court of Appeals, Tully's only written concession was that the State qualified Dr. Hofman to testify about what she looks for in evaluating the needs of an emergency room patient who presents with a traumatic injury. In Tully's brief to the Court of Appeals, he primarily argued that "[t]here was no testimony that the Court could have looked to that would qualify Dr. Hofman to testify about the implications of the presence or lack of presence of signs of physical injury in a sexual assault case."

The difference in the parties' positions underscores the nuances of their arguments. While Tully does not dispute that Dr. Hofman was qualified to testify as to signs of trauma or even the type of force that would be associated with traumatic injury, he does object to her qualifications to translate the medical opinion regarding the presence or absence of traumatic injury into the legal opinion of whether there was a rape.

The framework for deciding if an expert is qualified to offer an opinion is K.S.A. 60-456(b), which requires that an expert's opinion or inferences be limited to such opinions as the district court finds are (1) based on facts personally known or made known to the witness at the hearing and (2) "within the scope of the special knowledge, skill, experience or training possessed by the witness." K.S.A. 60-456(d) clarifies that opinion evidence "is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of the fact."

Using the qualification test of K.S.A. 60-456(b), did the State establish Dr. Hofman's qualifications to testify that the negative results of physical trauma do not mean A.C. was not raped because "rape" is a legal term?

The Court of Appeals majority answered this question by stating: "By admitting the doctor's testimony, the court deemed the doctor qualified to testify and found the doctor had special knowledge to impart to the jury." *Tully*, 2007 WL 1109309, at *8. This conclusion parrots the language of K.S.A. 60-456(c), which states: "Unless the judge excludes the testimony he or she shall be deemed to have made the finding requisite to its admission." While this provision fills the gap left by the lack of specific findings by the district court regarding the requirements of K.S.A. 60-456(b)(2), it does not explain the basis for finding that the evidence supported the implied findings, *i.e.*, that Dr. Hofman had knowledge, skill, experience, or training which qualified her to opine regarding the legal elements of rape and whether those elements had been met. See *Ward*, 292 Kan. 541, Syl. ¶ 3 (discretion is abused if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based).

Arguing there is no basis for concluding that the evidence established Dr. Hofman's qualifications, Tully cites *State v. Bressman*, 236 Kan. 296, 301, 689 P.2d 901 (1984). In *Bressman*, the court addressed whether the district court erred in permitting the emergency room doctor who examined the rape victim to state before the jury her opinion that the victim had been raped. As foundation, the doctor testified that over her 3½ years of employment at the hospital, she had seen 30 to 50 individuals who complained they had been raped. The doctor then testified the victim's emotional state was consistent with that of a rape victim and, based on her knowledge of rape, medical experience, and the victim's story, she concluded "Yes, I believe she was raped." *Bressman*, 236 Kan. at 302.

The *Bressman* court held that the district court committed prejudicial error in permitting the doctor to testify that in her opinion the victim had been raped. *Bressman*, 236 Kan. at 303. The court stated the doctor's conclusions were based on a psychiatric examination and diagnosis rather than a physical examination; however, the record did not show that the doctor was trained as an expert in psychiatry. Thus, the State failed to set forth the proper foundation for the doctor's testimony. Further, the court ruled the testimony invaded the province of the jury because the jury was charged with the duty to assess the state of mind and actions of the victim following the attack. *Bressman*, 236 Kan. at 303; see also *State v. Villanueva*, 274 Kan. 20, 32-33, 49 P.3d 481 (2002) (unlicensed social worker was unqualified to testify as an expert on rape trauma syndrome even though the court acknowledged the witness had considerable experience in counseling rape victims); *State v. Hayes*, 239 Kan. 443, 447-48, 720 P.2d 1049 (1986) (former assistant attorney who had previously served as a rape counselor unqualified to provide medical information regarding trauma but could provide lay opinion related to observations).

Although there are distinctions between this case and *Bressman*, the *Bressman* court's reasoning makes the point that there is a distinction between evidence of physical or mental trauma and evidence establishing rape. While Dr. Hofman was not asked to state an opinion as to whether A.C. had been raped, she was asked to

state an opinion as to whether the lack of traumatic injury was counter to a finding of rape. This conclusion requires application of the law—the legal elements of rape—and there is no showing that Dr. Hofman was qualified to know those elements. Further, as Judge Greene stated in dissent, the State failed to establish that Dr. Hofman possessed any special knowledge or skill related to determining whether a rape had occurred based on an emergency room evaluation. *Tully*, 2007 WL 1109309, at *11 (Greene, J., dissenting).

The district court abused its discretion in finding that the evidence in this case established Dr. Hofman's qualifications to opine as to whether the physical finding did or did not mean A.C. had been raped.

Consequently, on retrial, either a foundation for this evidence must be laid or the evidence should not be admitted. This error would not, by itself, be reversible.

ISSUE 4: *Did cumulative trial errors deprive Tully of a fair trial?*

Finally, Tully contends he was denied a fair trial due to cumulative trial errors. Although we have found reversible error on two grounds, the impact of the cumulative errors more fully explains our decision to reverse Tully's conviction.

In a cumulative error analysis, an appellate court aggregates all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect on the outcome of the trial is such that collectively they cannot be determined to be harmless. See *State v. Colston*, 290 Kan. 952, 978-79, 235 P.3d 1234 (2010). In other words, was the defendant's right to a fair trial violated because the combined errors affected the outcome of the trial? In a cumulative error analysis, "[i]f any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt." *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002).

In making the assessment of whether the cumulative errors are harmless error, an appellate court examines the errors in the context of the record as a whole considering how the district court dealt with the errors as they arose (including the efficacy, or lack

of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence. See *Ward*, 292 Kan. at 578; *State v. Dumars*, 33 Kan. App. 2d 735, 754-55, 108 P.3d 448, *rev. denied* 280 Kan. 986 (2005). "No prejudicial error may be found upon this cumulative effect rule . . . if the evidence is overwhelming against the defendant." *Colston*, 290 Kan. 952, Syl. ¶ 15; see, *e.g.*, *Alvarez v. Boyd*, 225 F.3d 820, 824-25 (7th Cir. 2000) (listing various factors to be considered in cumulative error analysis); *United States v. Fernandez*, 145 F.3d 59, 66 (1st Cir. 1998) (same); *United States v. Thomas*, 93 F.3d 479, 487 (8th Cir. 1996) (same); *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (same).

As we have discussed, there were three errors in this case. Each of these errors was compounded because, as Judge Greene stated in his dissent, they all relate to the contested element of force. *Tully*, 2007 WL 1109309, at *12 (Greene, J., dissenting). The interrelationship of these three issues is significant because the evidence against Tully was not overwhelming.

The evidence of force and consent primarily consists of A.C.'s accusations and Tully's denial of those accusations. Consequently, the resolution of the case largely depends on their credibility. G.N. testified to seeing Tully and A.C. acting as flirts. Because there was no mention by G.N. of either A.C. or Tully not being clothed, her testimony could be understood as contradicting both A.C. and Tully's rendition of events, which had A.C. being disrobed before or upon entering the bedroom or as relating to flirtation after the alleged rape, which would support a view that A.C. was not upset about the intercourse and would lend credence to Tully's testimony that the sexual contact had been voluntary and consensual.

Otherwise, the evidence relates to the various partygoers' testimony about what was said in the hours after the alleged rape. Much of that focus is on the confrontation between J.C. and Tully the next morning. As to that exchange, at least one witness indicated she thought it was clear that Tully admitted to using force. Other witnesses were not as specific and used more generic references to an admission of "rape." On the other hand, Tully testified he never admitted to rape or the use of force, and J.C.'s statement to

the detective supports his testimony. Another witness supports Tully's testimony to the extent of saying that Tully admitted to doing something "wrong." Tully said he made this admission because A.C. was only 14 years of age, not because he had engaged in nonconsensual sex where A.C. was overcome by force or fear. Further, in his brief Tully suggests that "[a] reasonable juror could readily believe that A.C. claimed that her sexual conduct with Tully was rape to avoid possible condemnation from her sister and her boyfriend . . . for having had sex with Tully." This argument is plausible in light of the various statements of the witnesses, including some evidence that A.C. was not emotional until confronted by J.C., and provides a possible motive for A.C. to claim rape even if the intercourse had been consensual.

In light of this conflicting evidence and the cumulative effect of the three errors on the jury's evaluation of whether the intercourse was nonconsensual and whether A.C. was overcome by force or fear, we conclude the State has not established beyond a reasonable doubt that the errors did not affect the jury's verdict. In fact, even if we were to treat the impeachment as a nonconstitutional evidentiary issue, not a *Doyle* violation, and apply K.S.A. 60-261 and K.S.A. 60-2105, we conclude there is a reasonable probability that the cumulative errors affected the verdict. Tully was denied a fair trial. Consequently, even if the errors on the first two issues were not viewed as a basis for reversal, we alternatively conclude reversal would be required by the cumulative errors.

Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed and the matter is remanded with directions to the district court for a new trial.

BEIER, J., not participating.

JEAN F. SHEPHERD and CARL B ANDERSON, JR., District Judges, assigned.