No. 79,003

STATE OF KANSAS, *Appellee,* v. JASON EUGENE CHANEY, *Appellant.*
(5 P.3d 492)

Opinion filed April 21, 2000.

*Rick Kittel,* assistant appellate defender, argued the cause, and *Stacy Patterson,* student intern, and *Jessica R. Kunen,* chief appellate defender, were with him on the brief for appellant.

*Keith E. Schroeder,* deputy district attorney, argued the cause, and *Timothy J. Chambers,* district attorney, and *Carla J. Stovall,* attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

SIX, J.: Jason Chaney, age 18, was convicted of raping 14-year-old K.G. who was too intoxicated to consent to sex. The Court of Appeals, in an unpublished opinion, reversed Chaney's conviction reasoning that, because the victim said "no" and called out for help, she was both sober enough to refuse sex and sober enough to consent to sex. The reversal is based solely on K.G.'s ability to say "no" and call for help during the incident. The Court of Appeals said:

"Consent is a two-edged sword; on the one side is consent and on the other is refusal to consent. If the victim can do one, he or she can do either. . . . An individual who has the ability to say no and refuse to consent to sex can also say yes and consent to the act." The Court of Appeals reasoned that although Chaney could have been convicted of forcible rape, he could not be convicted of rape because of K.G.'s intoxication. We granted the State's petition for review. See K.S.A. 20-3018(b); Supreme Court Rule 8.03 (1999 Kan. Ct. R. Annot. 53).

The single issue in this first impression case is whether there was sufficient evidence to support Chaney's rape conviction under K.S.A. 21-3502(a)(1)(C) (victim incapable of giving consent because of the effect of alcohol).

We hold that the evidence was sufficient to support a conviction for rape. We remand the case to the Court of Appeals for consideration of the other issues raised by Chaney in his appeal.

## FACTS

The facts of this case are disturbing. K.G. was raped while in the care of a babysitter who invited Chaney to K.G.'s home. K.G.'s mother worked a night shift. Shantel Fowler, the sitter, was hired by the mother to be with her three daughters while she worked. The Kansas Employment Commission recommended Fowler as a suitable babysitter. Fowler was 21 years old, with a 10th grade education and a learning disability. Because the sufficiency of the evidence is the issue, we set out the relevant facts in detail.

On March 25 or 26, 1995 (the exact date is uncertain), Fowler arrived at K.G.'s home at 10 p.m. to assume her duties. K.G. was awake, but her two sisters were asleep. Against K.G.'s mother's explicit instructions, Fowler invited others to the home. Chaney, joined by his friend Chris Cordero, brought beer. Chaney told K.G. that if she drank the beer through a straw, she would get drunk quicker. K.G. consumed at least two beers in this manner. She had consumed alcohol before. Afterward, Fowler described K.G. as "very well intoxicated." Fowler testified that K.G. had difficulty walking, her eyes were bloodshot red, her speech was slurred, and she was "tripping all over the place." Fowler's testimony was con-

tradictory on some points and difficult to follow. Her accounts of the events varied over time.

She testified at trial as follows. After K.G. became intoxicated, K.G. told Fowler she was going to bed. Chaney said he wanted to have sex with K.G. and tried to go with her. K.G. said no, she would go to her room alone. Chaney persisted and K.G. continued to refuse four or five more times. K.G. eventually went into her room and Chaney remained in the living room. Cordero and Fowler stepped outside onto the front porch. A few minutes later, Fowler heard K.G. calling, "help me, help me, Shantel, help me." Fowler ran back inside and opened the door to K.G.'s room. Fowler saw Chaney lying on K.G.'s bed, naked, with an erection. K.G. was crying. Chaney got up and slammed the door, shutting Fowler out of the bedroom. K.G. continued to call for help. Fowler admitted sitting on the couch and doing nothing. K.G. emerged from her room a few minutes later, still crying and asking Fowler for help. She told Fowler, "[W]e did it, and I didn't want to." Fowler did not call the police. Instead, she attempted unsuccessfully to reach a counselor at a mental health center. K.G. later told friends about the rape. The police learned of the rape while investigating an unrelated case.

On cross-examination, Fowler expanded her direct testimony: Chaney had "either persuaded himself in or K.G. invited him in" the bedroom. When Fowler checked on K.G. and Chaney the first time, Chaney was laying in bed in K.G.'s bedroom with what appeared to be no shirt, with the bottom half of his body covered with a sheet. Fowler then saw K.G. walking out of the bedroom with her clothes on to use the bathroom. K.G. then returned to the bedroom. No one forced K.G. back into the bedroom. Fowler then sat down and had a cigarette. Chaney came out fully dressed and left. Fowler went back to the bedroom to check and K.G. was on the bed in her bra and panties.

On re-direct, the prosecutor asked Fowler about K.G. coming out of the bedroom to use the bathroom and then going back into the bedroom. Fowler admitted she had never told police about such an event and had not testified to that fact at the preliminary

hearing. She explained that she remembered it only the night before her testimony at trial.

Detective Judy Trujillo also testified for the State. She interviewed Fowler and K.G. during the investigative phase of the case. Fowler told Trujillo that Chaney had been "flirting, wink[ing at and], hugging" K.G. Fowler also told Trujillo that K.G. and Chaney went into the bedroom together.

Trujillo also testified about K.G.'s statements. K.G. told Trujillo that Chaney returned to her home after the incident and had a conversation with her. The State inquired of Trujillo:

"[MR. SCHROEDER, the prosecutor]: Did she [K.G.] indicate that the defendant was told that she was saying there was nonconsensual sex?
"[DETECTIVE TRUJILLO]: Yes.
"[MR. SCHROEDER]: And what did she say the defendant said or did, when he heard that?
"[DETECTIVE TRUJILLO]: He confronted her asking her if that anything had happened like that, and was she forced into anything, and she responded no.
"[MR. SCHROEDER]: And why did she say that she said, at that point, that nothing had happened?
"[DETECTIVE TRUJILLO]: She said she was very afraid, and they were very large people, and she thought she better say that nothing happened."

Trujillo was present when Police Chief Dennis Stofer interviewed Chaney. Trujillo testified Chaney said during the interview that K.G. was "intoxicated" and acting silly. Chaney first denied being in the bedroom with K.G. He then admitted he was with K.G. briefly in the kitchen and she had kissed him with a strong forceful type of a kiss. Chaney also claimed K.G. wanted to have sex with him but he told her no, she was too young, 14-year-old kids can get you into trouble. Chief Stofer fabricated a story of finding pubic hair while questioning Chaney and Chaney responded with a claim that K.G. had reached in his pants. The Chief asked Chaney if he had had consensual sex with K.G. Chaney indicated he preferred not to cause himself or K.G. any problems and did not want to answer that question.

K.G. testified she had trouble remembering details about what happened. She remembered that she became drunk and that she ended up in the bedroom with Chaney as "he wanted to go in there, so I went with him." When in the bedroom, K.G. said Chaney

"started to kiss me" and "he started to touch me." She did not remember if she said anything when he started the kissing and touching. She remembered that Chaney took off her clothes and had sex with her. She did not remember if she asked Fowler for help. She cried and remembered Chaney telling her "[She] wouldn't regret it." When asked by the State, "Did you consent to that," she answered, "no sir."

The State charged Chaney with alternate counts of rape under K.S.A. 21-3502(a)(1)(A) and (C). One count alleged Chaney raped K.G. by force or fear; the other alleged he had intercourse with K.G. while she was incapable of giving consent because of the effect of alcohol ("rape by intoxication"). Chaney did not testify. He put on no evidence. He objected to an instruction on rape by intoxication. Chaney's closing argument defense included a suggestion of consent. The jury acquitted Chaney on the force and fear count but convicted him of rape by intoxication.

## DISCUSSION

We review all the evidence, viewed in the light most favorable to the prosecution. If we are convinced that a rational factfinder could have found Chaney guilty beyond a reasonable doubt, we affirm his conviction. See *State v. Johnson*, 266 Kan. 322, 326, 970 P.2d 990 (1998).

K.S.A. 21-3502 defines rape. Intoxication of the victim, as it relates to lack of consent in a rape case, is an element that has been part of 21-3502 since 1969. See L. 1969, ch. 180, § 21-3502.

In 1969, 21-3502 read:

"(1) Rape is the act of sexual intercourse committed by a man with a woman not his wife, and without her consent when committed under any of the following circumstances:

(a) When a woman's resistance is overcome by force or fear; or

(b) When the woman is unconscious or physically powerless to resist; or

(c) When the woman is incapable of giving her consent because of mental deficiency or disease, which condition was known by the man or was reasonably apparent to him; or

(d) *When the woman's resistance is prevented by the effect of any alcoholic liquor, narcotic, drug or other substance administered to the woman by the man or another for the purpose of preventing the woman's resistance, unless the woman*

*voluntarily consumes or allows the administration of the substance with knowledge of its nature.*"

The italicized intoxication provision was aimed at prosecuting those who administered some intoxicating substance to a victim without the victim's knowledge. The victim's voluntary intoxication was expressly precluded as a basis for rape.

In 1993, the legislature removed subsection (d) and added language relating to intoxication of a victim to subsection (c). See L. 1993, ch. 253, §§ 1, 2.

Chaney was convicted under the 1993 version of 21-3502, which reads, in pertinent part:

"(a) Rape is: (1) Sexual intercourse with a person who does not consent to the sexual intercourse, under any of the following circumstances:

(A) When the victim is overcome by force or fear;

(B) when the victim is unconscious or physically powerless; or

(C) when the victim is incapable of giving consent because of mental deficiency or disease, *or when the victim is incapable of giving consent because of the effect of any alcoholic liquor, narcotic, drug or other substance, which condition was known by the offender or was reasonably apparent to the offender.*" (Emphasis added.)

We find no published opinions in which a defendant has been found guilty under the 21-3502(a)(1)(C) intoxication provision.

Chaney contends there was insufficient evidence to prove that K.G. was so intoxicated that she was unable to give valid consent. He reasons that K.G. was not so intoxicated because "she was capable of refusing sexual intercourse and did so." Chaney argues that only if K.G. had either said nothing or had consented would a question about being incapable of giving valid consent arise. Chaney's argument implies that a person is only incapable of giving consent due to the effects of alcohol if that person is so intoxicated as to be near the point of either passing out or blacking out.

Although not discussed in the Court of Appeals opinion, Chaney relies on two foreign cases. The first is *State v. Call*, 139 N.H. 102, 650 A.2d 331 (1994.) *Call* involved the alleged rape of a mentally retarded woman. In reversing Call's conviction for rape, the New Hampshire court held that "the evidence was insufficient to prove beyond a reasonable doubt that the victim was 'mentally defective'

within the meaning of the statute." 139 N.H. at 104. The State failed to put on sufficient evidence of the victim's mental capacity, or lack thereof.

The second is *Salsman v. Com.*, 565 S.W.2d 638 (Ky. App. 1978). *Salsman* held: "In determining whether a woman is incapable of granting consent because she is mentally defective, the sole question is whether she is capable of appraising the nature of the sexual act being performed." 565 S.W.2d at 640. Salsman was convicted of first-degree sexual abuse. Because the victim understood that Salsman was seeking to perform sexual acts upon her, there was no incapacity to consent because the victim was mentally defective. 565 S.W.2d at 640.

Here we are concerned not with incapacity to consent based on a mental defect, but intoxication rendering the victim unable to give valid consent. Further, *Call* and *Salsman* deal with an altogether different standard. The Court of Appeals did not base its reversal on these cases and we decline to apply them here.

The Court of Appeals drew a distinction between being intoxicated and being unable to consent to sex as a result of intoxicating liquor. The distinction suggests there must be a certain level of intoxication for a victim to be unable to consent. The derivation of this standard is unclear. K.S.A. 21-3502(a)(1)(C) says nothing about a requisite level of intoxication. The Court of Appeals observed: "While there was an abundance of evidence that K.G. may have been intoxicated or drunk, there is no evidence that she was unable to consent to sexual relations as a result of the intoxicating liquor." This conclusion implies that because K.G. said that she was *able* to tell Chaney no, she was *able* to give consent under 21-3502(a)(1)(C). K.G. testified:

"Q . [K.G.] are you telling this Court that you were so intoxicated the night this supposedly happened that you weren't able to tell Jason no?
"A. I did tell him no.
"Q. So you weren't so overcome by alcohol that you couldn't tell somebody not to do this?
"A. I did tell him."

The Court of Appeals characterized K.G.'s answers "direct evidence from the victim's own testimony that she was, in fact, capable

of consenting and was not affected by the liquor to the extent she could not consent." The Court of Appeals apparently equates the ability to make verbal protestations with sobriety. That equation is the sole premise for the Court of Appeals' conclusion that K.G. was not drunk enough to be unable to consent. The Court of Appeals concluded that Chaney should have been convicted of forcible rape.

We disagree with the Court of Appeals on several grounds.

First, we cannot adopt the Court of Appeals' reasoning which hinges on the fact that K.G. said "no" to Chaney. The Court of Appeals clothes one simple word with significant legal meaning and significant ramifications. It does this in two ways. One, the Court of Appeals concludes that if a victim is able to say "no" she is also capable of saying "yes," in other words, giving consent. Inherent in this conclusion is the assumption that the word "no" is a decision rather than merely a word. Prior cases question whether such significance may be placed on the word "no." See, *e.g.*, *Keim v. State*, 13 Kan. App. 2d 604, 608, 777 P.2d 278 (1989). Two, the Court of Appeals noted that Chaney could have been convicted of forcible rape. It appears the Court of Appeals reasoned that if a victim says the word "no," there must necessarily be force or fear involved.

We do not conclude that a victim, no matter how drunk, disoriented, and incoherent, somehow exhibits clarity of thinking by instinctively responding to unwanted advances. It is not outside the realm of reason to think that a victim can be too drunk to provide valid consent to sex yet remain capable, on some level, of rejecting unwanted aggression. See *People v. Teicher*, 52 N.Y.2d 638, 439 N.Y.S.2d 846, 422 N.E.2d 506 (1981); *People v. Cirina*, 143 App. Div. 2d 763, 533 N.Y.S.2d 305, *appeal denied* 73 N.Y.2d 854 (1988).

In *Teicher*, a woman was assaulted by her dentist while partially sedated. The dentist was convicted of sexual abuse in the first degree where the victim was incapable of consent by reason of physical helplessness. On appeal, the dentist argued that the evidence was insufficient to convict him as a matter of law because the woman at one point during the assault pulled her hand away from where he had placed it on his body. The New York court held that

"although she had enough control over her body to pull her hand away after [the dentist] had placed it against his penis, the trier of fact was entitled to infer that she lacked capacity to consent to the original touching because of her generally weakened condition." 52 N.Y.2d at 646.

In *Cirina,* a voluntarily intoxicated 13-year-old girl was attacked by Cirina. Cirina was convicted of sodomy and argued on appeal that the evidence was insufficient to convict him as a matter of law. The court held that "substantial testimony regarding the complainant's voluntary intoxication enabled the trier of fact to infer that she lacked capacity to consent due to her generally weakened condition." 143 App. Div. 2d at 763.

Nor do we conclude that the existence of a stated "no" necessarily implicates force or fear. The determination of such an implication is for the jury. The following examples help illustrate the weakness of both of the Court of Appeals' assumptions in this regard.

A heavily intoxicated young woman is escorted by her date to the door of her apartment. She has difficulty walking so the date helps her inside. They engage in foreplay and the man asks for sex. The woman, drunk and laughing, says, "no." The man continues in his efforts to cajole her. She says "no," but he proceeds to undress her and have sex with her anyway. In her drunken state she does not physically resist nor become any more insistent that he stop. She remembers little after the incident except that it happened and she said "no."

In the dating example, was there force or fear? The victim was not unconscious or physically powerless. She was clearly intoxicated, but just as clearly said "no." Under the Court of Appeal's reasoning, unless the jury were to find force or fear, there is no rape—her capacity to say "no" equates to a capacity to say "yes."

The application of this reasoning becomes perhaps more stark in the case of a victim who is unable to consent because of mental deficiency. A severely mentally retarded woman is approached by a neighbor in her home. He asks to have sex with her and begins to touch her. She is confused about the activity, and when he becomes more insistent she says "no." He has sex with her without a

struggle. Her handicap prevents her from communicating what happened to her in more than rudimentary terms.

Again, in the mental deficiency example, was there force or fear? The victim was not unconscious or physically powerless. She was clearly mentally deficient, but just as clearly said "no." Unless a "no" here supports a jury force or fear finding, under the Court of Appeals' reasoning, there is no rape, for: "[c]onsent is a two-edged sword; on the one side is consent and on the other is refusal to consent. . . . If the victim can do one, he or she can do either." We do not agree. That analysis places far too much emphasis on mere words. The jury determination of whether consent was given or was valid requires consideration of *all* facts surrounding the event, not simply the words spoken.

An examination of 21-3502(a)(1)(C) does not support the Court of Appeals' interpretation of what is required to sustain a conviction. Under the Court of Appeals' analysis, a rape victim would have to be intoxicated to the point of unconsciousness to be unable to consent. Unconsciousness is clearly not required by 21-3502(a)(1)(C). Unconsciousness, as it relates to an inability to consent to sex, is set out as a separate means of rape under 21-3502(a)(1)(B) (rape is sexual intercourse with a person who does not consent because "the victim is unconscious or physically powerless").

Another ground for disagreement with the Court of Appeals' analysis is that it appears to substitute the judgment of the court for that of the jury. The jury's role in making these determinations is well established. See *State v. Borthwick*, 255 Kan. 899, 911-12, 880 P.2d 1261 (1994) (whether victim is overcome by fear and unable to consent is a question to be resolved by the jury); *State v. Juarez*, 19 Kan. App. 2d 37, 40, 861 P.2d 1382 (1993) (whether a mentally deficient victim is able to consent is a question for the jury). We cannot disturb the jury's finding unless we can conclude that no rational factfinder could find Chaney guilty beyond a reasonable doubt. See *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

The Court of Appeals attempts to establish the capability to give valid consent as a matter of law where there is evidence the victim

said "no." We cannot agree. Whether K.G. was sufficiently intox-icated is a question appropriate for jurors, not appellate courts. By attempting to answer that question on a cold record, we would impermissibly infringe on the fact-finding role of a jury. In *Borthwick*, we considered the issue of determining the existence of force or fear, and we said:

"Fear in and of itself is inherently subjective. Unless otherwise limited in the statutory definition as it is in Pennsylvania, a finding that a particular victim is overcome by fear does not require proof that it is fear induced by threat of force that would prevent resistance by a reasonable person. What renders one person immobilized by fear may not frighten another at all. The reasonableness of a victim's claim that she was overcome by fear necessarily enters into the factfinder's determination about whether the victim is telling the truth. . . .

. . . .
". . . The reasonableness of a particular victim's fear may affect the jury's as-sessment of the victim's credibility in arriving at its verdict. The 'force' required to sustain a rape conviction in this state does not require that a rape victim resist to the point of becoming the victim of other crimes such as battery or aggravated assault. K.S.A. 21-3502 does not require the State to prove that a rape victim told the offender she did not consent, physically resisted the offender, and then en-dured sexual intercourse against her will. It does not require that a victim be physically overcome by force in the form of a beating or physical restraint. It requires only a finding that she did not give her consent and that *the victim was overcome* by force or fear to facilitate the sexual intercourse." 255 Kan. at 913-14.

Like force or fear, incapacity to consent is a highly subjective concept. It is not one which lends itself to definition as a matter of law. In *Borthwick,* we declined to define in absolute terms the degree of force required to sustain a rape conviction. Our holding here is no different. We decline to define the degree of intoxication required to sustain a rape conviction under 21-3502(a)(1)(C).

Lay persons are familiar with the effects of alcohol. If the jury concluded K.G. was drunk enough to be unable to consent to sex, we should give great deference to that finding. See *State v. Southard*, 261 Kan. 744, 751, 933 P.2d 730 (1997). It is not our func-tion to reweigh the evidence or judge the credibility of witnesses. *State v. Nunn*, 244 Kan. 207, 220, 768 P. 2d 268 (1989).

There was sufficient evidence that K.G. was both psychologically and physiologically impaired due to the effects of alcohol. Fowler

testified that K.G. was "very well intoxicated," not somewhat intoxicated. Fowler also described K.G. as having significant difficulty both walking and talking. According to Fowler, K.G. was tripping over objects and had bloodshot eyes and slurred speech. Chaney also told the police that K.G. appeared intoxicated to him and that she was acting silly. K.G. knew she told Chaney "no"; however, her knowledge of that fact and her ability to say the word "no" during the sexual assault do not necessarily suggest sobriety or any particular level of cognitive functioning. Saying "no" to untoward sexual aggression may be an instinctual response rather than the result of rational decision-making. K.G. exhibited little indicia of rational decision-making during or after the assault, and her memory of it was quite limited. She remembered telling Chaney "no" and remembered that Chaney took her clothes off. However, when Fowler came to her aid and asked how she could help, K.G. said she did not know. Clearly K.G.'s only thought was to call out for help in hopes Fowler or someone else would intervene. This suggests that K.G. did not have the clarity of thought the Court of Appeals attributed to her. Moreover, the jury could have concluded that Chaney deliberately induced K.G.'s intoxicated state to prevent her resistance to sexual advances. The jury's conclusion that K.G. was unable to consent because of the effects of alcohol is supported by the evidence.

The record discloses thoughtful consideration on these matters by the jury. During deliberations the jury sent out a written note asking for the definition of "force or fear" and "valid consent because of the effect of any alcoholic liquor." The judge responded that those concepts were subjective and that the jurors should use their common sense and experience in determining those issues.

Shortly after the first note, a second appeared. The jury inquired: "We would like the transcript of [K.G.'s] testimony on Monday. We also would like a dictionary." The district judge responded, "If you have specific portions of the testimony of [K.G.] that you would like read back, the court reporter will attempt to locate those portions and read them back in open court. We cannot provide you with a dictionary or the transcript of testimony requested."

The third note followed immediately: "We wish the testimony of [K.G.], specifically the time she was in the bedroom with [Chaney]." The testimony was read to the jury.

The jury in this case was faced with three choices: (1) convict on rape by force or fear; (2) convict on rape by intoxication; or (3) acquit. The jury found that K.G. was not overcome by force or fear, a finding only it is entitled to make. Considering the contradictory testimony in this case, we can speculate that the jury questioned whether K.G. consented. The jury heard testimony that: (1) K.G. went with Chaney into her bedroom, (2) K.G. walked out of the bedroom with her clothes on to use the bathroom and returned to the bedroom, and (3) Chaney claimed that whatever happened in the bedroom was consensual. Consent or no, the jury concluded that K.G. was *incapable* of consent because of the effect of alcoholic liquor. Under these circumstances and our standard of review, we find the jury's decision to be logical, reasonable, and supported by the evidence.

The Court of Appeals is reversed, and the case is remanded to the Court of Appeals to address the remaining issues raised in Chaney's direct appeal.

ABBOTT, J., concurring with majority.

ALLEGRUCCI, J., dissenting: I respectfully disagree with the majority's holding that the evidence was sufficient to support the conviction of rape by intoxication.

The majority misconstrues the Court of Appeals decision. The majority notes that the Court of Appeals drew a distinction between being intoxicated and being unable to consent to sex as a result of intoxication. The majority then states: "The derivation of this standard is unclear." I would suggest the majority reread K.S.A. 21-3502(a)(1)(C). It clearly states "when the victim is incapable of giving consent *because of the effect of any alcoholic liquor.* . . ." (Emphasis added.) The majority has rewritten the statute to provide only that a victim be intoxicated. Obviously, the victim could be "intoxicated" and still be able to understand that defendant wants to have sex and be able to consent. The State is required to present evidence that due to the victim's intoxication,

she could not consent. The best evidence would be from the victim. The evidence was that she understood what defendant wanted, and she said "no." She did not want to have sex and told him so. She testified she did not consent. She even cried out for help when the defendant was taking her clothes off in the bedroom. As the Court of Appeals noted, the State presented no expert testimony as to the effect of consuming two beers by this victim. The Court of Appeals correctly concluded that "there was an abundance of evidence K.G. may have been intoxicated or drunk, [but] there is no evidence that she was unable to consent to sexual relations as a result of the intoxicating liquor."

The majority's gratuitous examples to illustrate the weakness of the Court of Appeals' holding are not relevant and deal with situations in which consent is an issue. Here, consent was not an issue. The defendant never claimed K.G. consented. In fact, when he was arrested and interrogated by the police officers, he denied even being alone with K.G. He denied having sex with K.G., let alone having consensual sex with her.

Chaney's counsel argued various points; consent was not one of them. The defendant's closing argument covers 10 pages in the transcript of the trial, and the only mention of consent is relative to an attack on K.G.'s credibility:

> "I'll submit, ladies and gentlemen, that there has not been evidence submitted to you that would establish beyond a reasonable doubt that any of these things occurred. And particularly that anything occurred without the consent of [K.G.]. Now, none of us like to think of 14 year olds engaging in sex. I don't know about you, but it kind of bothered me when I heard Judy Trujillo testify that when she talks to [K.G.], that she said, it's just the regular old thing. I'm not sure 14 year olds should refer to it as just the regular old thing. I hope it's not regular. It also bothered me that [K.G.] lied to Detective Trujillo. When Detective Trujillo asked her about intoxication, [K.G.] said, I only had one beer in my entire lifetime before that point, before that date, that's all I ever had. That's not what she testified to at preliminary hearing. When she's under oath, in front of the judge, she said I was feeling kind of dizzy like I usually do when I got drunk. Then on direct examination of [the county attorney] she testifies she's got an alcohol problem, and that's a long ways from having only one beer in your lifetime."

I must also take issue with the majority's stating that the Court of Appeals' analysis requires that "a rape victim would have to be

intoxicated to the point of unconsciousness to be unable to consent." The word "unconscious" does not appear in the Court of Appeals opinion, nor can it be inferred. The majority is blatantly incorrect and has resorted to using smoke and mirrors to justify its decision. The Court of Appeals' rationale is clearly stated as follows:

"It is noted that the statute neither speaks of nor does it require a victim to be intoxicated. Thus, simple proof of intoxication, without more, is not sufficient. Consent is a two-edged sword; on one side is consent and on the other is refusal to consent. If the victim can do one, he or she can do either.

. . . .

"While there was an abundance of evidence that K.G. may have been intoxicated or drunk, there is no evidence that she was unable to consent to sexual relations as a result of the intoxicating liquor.

"Indeed, there is direct evidence from the victim's own testimony that she was, in fact, capable of consenting and was not affected by the liquor to the extent she could not consent.

"The victim denied that she was so intoxicated she was not able to tell defendant no. The record indicates that she told defendant no on several occasions. An individual who has the ability to say no and refuse to consent to sex can also say yes and consent to the act.

"The evidence in this case indicates to us that this was a case of forcible rape, and the State utilized the protestations of the victim to prove that count of the indictment. On final argument, the State argued:

" 'Then there is probably the most powerful statements in the case and that is the fact we have an individual who says that on multiple occasions she heard [K.G.] plead for help and say, no and say, stop. Now the defendant wants you to believe that there is no evidence of force or fear. There's no evidence she was held down or tied down. That she was extremely afraid. Think about those pleas. Stop, help me, help me, no. Isn't that all the evidence you need for force, or force and fear.'

"We agree with the comments of the prosecutor on closing argument. The State's problem is that it did not prove that K.G. was unable to consent because of intoxicating liquor. In fact, the evidence shows that K.G. did not consent, knowingly telling defendant no. This was the testimony of K.G., and it is the only direct testimony in this case which indicates whether she was capable of withholding her consent because of her consumption of two beers."

I further disagree with the majority's interpretation of 21-3502(a)(1)(C). Although the majority notes the 1969 version of the statute and the change resulting from the 1993 amendment, it totally ignores the intent and purpose of the 1993 amendment. In 1983, the statute was amended to eliminate the requirement that a victim must resist and the defendant must overcome that resis-

tance to constitute rape. This amendment triggered the 1993 amendment, since the central inquiry became consent and not whether the victim's resistance was overcome. The purpose of the 1993 amendment, according to testimony of the bill's sponsor, was to eliminate the distinction in subsection (d) of alcohol voluntarily consumed by the victim and that which is administered by the defendant or someone else:

"It seems that when a victim is incapable of giving consent because of the effect of any alcoholic liquor or drug, it is rather immaterial who has administered the substance. A rapist should not be able to hide behind the fact that he didn't administer the drugs or he didn't know they had been administered when it is obvious that the victim cannot give consent for some reason." Testimony by Senator Lillian Papay, Senate Judiciary Committee (Feb. 18, 1993).

Clearly, the amendment applies when the defense is that the victim consented to sexual intercourse. It provides additional protection for the victim in such a case. However, the way the statute was amended, the legislature failed to clearly convey that intent but, rather, confused what constitutes the offense of rape. The intent in amending subsection (c) was not to create an alternative count of rape. In the present case, the State prosecutor recognized the confusion created by the amendment in his closing argument to the jury:

"I want to hit on a few things raised by [the defense attorney], and then I will conclude. I will not take too much more of your time. [The defense attorney] noticed or noted that Instruction No. 8 that deals with the theory of rape by means of intoxication. There's the issue of whether or not she was capable of consenting when she said she did [*sic*] consent. Read that instruction very carefully. It's a confusing point because what you will find that the State has to prove that the sexual intercourse occurred without the consent of [K.G.], and then it goes on to say that she was incapable of giving consent because of the effect of alcoholic liquor. So you're going to have to use your common sense in interpreting what the law means on this particular item. It can be somewhat confusing. One way it seems to indicate she didn't consent, and then we have to prove that she didn't consent, that she wanted to. Review that."

We are to strictly construe criminal statutes in favor of the accused. This, however, is subordinate to the rule that judicial interpretation must be reasonable and sensible to effect the legislative design and intent. *State v. Vega-Fuentes*, 264 Kan. 10, 14, 955 P.2d

1235 (1998). The majority interprets the 1993 amendment to create an additional definition of rape, a separate count, if you will. K.S.A. 21-3502(a)(1)(C), as applicable here, reads: "Rape is . . . [s]exual intercourse with a person who does not consent to the sexual intercourse . . . when the victim is incapable of giving consent because of the effect of any alcoholic liquor . . . ." If the victim does not consent, what is the logic, relevance, or rationale of further requiring that she be incapable of consenting? It makes no sense. Further, the logical extension of that interpretation would be that sexual intercourse with a victim who does not consent, but who is capable of consenting, would not be rape. If that is a reasonable, strict interpretation of 21-3502(a)(1)(C) in favor of the defendant, then God help us all.

It is only where consent is an issue that 21-3502(a)(1)(C) is relevant and applicable. If the defendant claims the sexual intercourse was consensual and there is evidence that the victim consented either verbally or by her actions, then her inability to consent due to intoxication becomes relevant.

In *State v. Borthwick*, 255 Kan. 899, 914, 880 P.2d 1261 (1994), this court stated:

"The 'force' required to sustain a rape conviction in this state does not require that a rape victim resist to the point of becoming the victim of other crimes such as battery or aggravated assault. K.S.A. 21-3502 does not require the State to prove that a rape victim told the offender she did not consent, physically resisted the offender, and then endured sexual intercourse against her will. It does not require that a victim be physically overcome by force in the form of a beating or physical restraint. It requires only a finding that she did not give her consent and that the victim was overcome by force or fear to facilitate the sexual intercourse."

As the Court of Appeals noted, it was unfortunate the jury acquitted the defendant of rape by force or fear. In my view, the defendant committed rape by force or fear and why the jury did not convict him of that offense is a mystery. It could well have been that the jury was as confused as the prosecutor as to the meaning of Instruction No. 8. However, I cannot agree that two wrongs make a right. I would affirm the Court of Appeals.