NOT DESIGNATED FOR PUBLICATION

No. 121,638

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JEREMY LEE MASSEY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Lyon District Court; JEFFRY J. LARSON, judge. Opinion filed November 20, 2020. Affirmed.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Carissa Brinker*, assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., MALONE, J., and WALKER, S.J.

PER CURIAM: A jury convicted Jeremy Lee Massey of rape under K.S.A. 2018 Supp. 21-5503(a)(2). Massey raises several reasons he should get a new trial: (1) The district court excluded evidence of his alleged victim's prior sexual conduct, (2) the prosecutor misled the jury in closing arguments by misstating the law on consent, (3) the jury received no limiting instruction on K.S.A. 60-455 evidence, and (4) the cumulative effect of these errors denied him a fair trial. As a fifth issue, Massey also argues that the district court violated his right to a jury trial under the Kansas Constitution when it

1

determined his criminal history. Because none of these issues constitutes reversible error, we affirm Massey's conviction and sentence.

FACTS

This is a fact-sensitive case and therefore we will set those facts out in some detail. Massey and S.J. had been dating for five and half years and were living together in a house in Emporia, Kansas, with their three-year-old daughter. They split up in early August 2018, and S.J. moved out with their daughter. Over the next few weeks, S.J. returned to the house several times to check on her cat, retrieve personal items, and allow her daughter to see Massey.

*The night before*

One of those times was August 31, 2018, when the events leading to this case took place. While moving some of her belongings out of the house during the day, S.J. noticed that her cat had no food. So after picking her daughter up from school, S.J. returned with some cat food around 5:30 p.m. When she arrived, Massey had just come home from work.

They decided to drive around and talk. Massey wanted to get back together, but S.J. was not interested unless he sought counseling to address his anger issues. When they returned between 8 p.m. and 8:30 p.m., S.J. accepted Massey's invitation for her and their daughter to stay for dinner. Before going in, S.J. parked her van down the street and left the keys inside so that Massey could not take them later to prevent her from leaving. Once inside, S.J. told Massey she wanted no physical contact that night; she was not there to have sex.

As Massey made dinner during the next hour, he and S.J. started drinking from a large bottle of Fireball whiskey. S.J. did not drink often, but she drank that night in part because Massey earlier that night said that he might start dating other people. This upset S.J. because she hoped Massey would use the time apart to work on bettering himself. S.J. also drank to prevent Massey, who she said started drinking before she did, from drinking and hurting her; she said that Massey got violent with her when he drank.

In the hour before dinner, Massey and S.J. together drank about two-thirds of the bottle of Fireball. S.J. said that she drank a third of the bottle, then Massey had a drink, then she finished the bottle. Massey said that they started out taking shots before S.J. switched to chugging straight from the bottle. Massey had never seen S.J. drink like this before; he told S.J. to slow down as she kept chugging from the bottle and started slurring her words. When they sat down for dinner around 9:30 p.m. or 10 p.m., Massey thought S.J. had had too much to drink.

The last thing S.J. remembered from that night was sitting down to dinner. She was fully clothed, wearing a bra and underwear, a shirt, and shorts. The next thing she knew, she awoke several hours later lying naked on the living room floor next to Massey.

Massey filled in the gap between dinner and the next morning. After dinner, he put their daughter to sleep on the living room couch before joining S.J. outside for another talk. They spoke for about 10 minutes, until S.J. fell asleep. As Massey brought S.J. inside, she threw up on the living room floor and urinated in her pants. He said that S.J. removed her shirt and tried to use it to clean up the vomit before passing out again. Massey removed the rest of S.J.'s clothes and put them in the washer. Sometime between 10:30 p.m. and 10:45 p.m., he laid a sleeping and naked S.J. down on the living room floor with a blanket and a pillow. Rather than sleep in his own bed, Massey laid down on the floor next to S.J.

*The sexual encounter*

Several hours later, Massey engaged in several sexual acts with S.J. They offered different accounts of the encounter but described the same sequence of events: Massey woke S.J. up, kissed her, performed oral sex, penetrated her vagina with his penis, unsuccessfully tried to put his penis in S.J.'s mouth (she clenched her jaw shut), and penetrated her anus with his finger and penis.

In her account, S.J. described coming to early the next morning lying naked on the living room floor next to a shirtless Massey. She felt tired and sleepy, and it took her several moments to get her bearings and realize where she was. When Massey kissed S.J., she told him to stop. She also said that she went in and out of consciousness during the sexual acts, experiencing what she described as waves of intoxication. She could not move, speak, or open her eyes but could hear and feel what was happening to her. S.J. could not remember how long any individual acts or the entire encounter lasted because she had no sense of time.

Massey offered a different account. He said that he kissed S.J. and tried to wake her up for sex twice. The second time, Massey said, S.J. kissed him back. He also knew how much S.J. had to drink that night and that she had presumably passed out from excessive alcohol consumption. Even though S.J. provided no verbal consent and Massey knew how much S.J. had to drink the night before, he took S.J.'s kiss as her consent to the sexual acts that followed. In their relationship, he explained, they "agree[d] to have sex with each other as long as there was a kiss initiating and it was reciprocated." Massey said that during the sexual acts, S.J. had her eyes closed, did not speak or move, and snored at least once for a few seconds. But he thought S.J. was awake and enjoying the encounter because she moaned and twitched her shut eyes. Massey said that the entire encounter lasted about 10 minutes.

*The morning after and the investigation*

Sometime later that morning, S.J. woke up again, this time to Massey's phone alarm. She felt hungover and tired and smelled vomit in her hair. She guessed that this was around 4:30 a.m. because while they were dating Massey would set his alarm for that time to make it to work by 5:30 a.m. Massey said that he had to be at work that morning at 5:30. S.J. showered, donned a spare set of clothes at the house, then left with her daughter after a brief conversation with Massey.

Late the next evening, S.J. went to the hospital in Emporia because her anus had been bleeding heavily since leaving Massey's house. She reported that she had been raped, and she recounted her version of the encounter to Emporia Police Officer Gabriel Withington. The Emporia hospital sent her to a hospital in Topeka that had the proper staffing to administer a sexual assault exam. At the Topeka hospital just after midnight— about two days after the alleged assault—S.J. consented to a forensic exam administered by a sexual assault nurse examiner (SANE) named Joy Thomas. The exam revealed two prominent anal tears, which tracked S.J.'s statements to Thomas that she experienced significant bleeding in that area since the encounter. Thomas observed no vaginal injuries.

A week later, S.J. recounted her story again to Detective Kelly Davis, who was investigating the case. Davis and another detective interviewed Massey a few days later; Massey agreed to the interview, and he received and waived his *Miranda* rights. Massey first denied that any sexual acts occurred before admitting that he engaged in oral and vaginal sex with S.J. He still denied having anal sex, but when informed of S.J.'s anal bleeding, he admitted that he penetrated S.J.'s anus using only his finger. He said that he knew how much S.J. had to drink that night—he saw her chug four inches of whiskey, throw up on herself, urinate in her pants, and black out from drinking too much. According to Detective Davis, Massey said that S.J. kissed him but fell asleep or passed

out during oral sex; Massey said that he kept going "because he didn't want to cheat on her, but he still wanted to have sex."

Massey consented to a search of his phone. When a third detective, David Holmes, analyzed the phone, he found a video and several photographs produced the morning the alleged assault occurred. The video was created at 5:17 a.m. and depicted Massey anally penetrating S.J.

*The charges and the trial*

The State charged Massey with three crimes: (1) rape of a person who was incapable of consenting because of intoxication, under K.S.A. 2019 Supp. 21-5503(a)(2); (2) aggravated criminal sodomy, under K.S.A. 2019 Supp. 21-5504(b)(3)(C); and (3) breach of privacy, under K.S.A. 2019 Supp. 21-6101(a)(6). The State dismissed the privacy charge during the jury instruction conference at trial.

Before trial, Massey moved to admit evidence of S.J.'s prior sexual conduct under K.S.A. 2019 Supp. 21-5502. He wanted to testify that during his relationship with S.J., they had "an understanding or agreement . . . wherein sexual desires or requests would be satisfied without denial." In an affidavit attached to the motion, Massey described the agreement as "allow[ing] either party to request sexual activities at any time, and further that neither party could deny the request." In other words, the agreement "mean[t] that consent was continually given." Massey wanted to testify to specific instances during their relationship in which S.J., relying on this arrangement, "initiat[ed] sexual intercourse while he was asleep but aroused." The district court partially granted the motion, allowing Massey to testify generally about he and S.J.'s "prior understanding" but preventing him from presenting any evidence about specific instances at trial without prior approval.

6

This evidentiary issue resurfaced at the two-day jury trial. S.J. testified that when she and Massey were dating, one partner could wake the other up for sex if the other partner was awake and willing. But she did not think this understanding was still in place because they were broken up. She said that although a kiss was one way a partner could consent to sexual activity in their relationship, both partners would need to be awake and alert. Massey agreed with S.J.'s description of consent in their relationship, including that a kiss constituted consent, but he added that "we were to agree to have sex with each other as long as there was a kiss initiating and it was reciprocated." During the trial, Massey renewed his request to present evidence about specific instances in which S.J. initiated sex with him while he slept, but the district court denied the request.

In closing arguments, the prosecutor told the jury that it had to find that S.J. lacked the capacity to consent. The prosecutor repeatedly emphasized this point in the rebuttal, arguing that S.J.'s capacity to consent, not whether she did consent, was the key issue:

> "Her body was ready for sex, but was she capable of actually consenting or was that a physical reaction? When you go back to the jury room I encourage you to read the instructions. Read the elements of the rape . . . and ask yourself, was there anything in there that says whether consent actually had to be given or is it just that she was incapable of giving that consent because of her condition, whether Mr. Massey knew about that condition and that condition was readily apparent to him.
> . . . .
> "We are not arguing whether there was consent or was not consent, that is not what this case is based upon. This case is based upon what the evidence has shown. The evidence has shown that [S.J.] was so drunk that she passed out. So drunk when Mr. Massey wanted to have sex, she didn't even open her eyes. So drunk that when she's crying out in pain because he is anally penetrating her, she cannot and does not move. Looking at that, did Mr. Massey really think that she was capable of giving consent at that time? Was she capable of even giving consent at that time?
> . . . .

". . . I encourage you to use your common knowledge and experience in analyzing whether [S.J.] was capable of giving that consent. Their agreement—both parties said that there was an agreement, but does that agreement really matter if she's capable or not capable of giving consent, not capable of reciprocating in a knowing way.

. . . .

". . . The instructions on whether she was capable of giving consent, not whether there was consent given."

After closing arguments, the jury convicted Massey of both remaining charges, rape and aggravated sodomy. Massey moved for an arrest of judgment on the sodomy charge based on a discrepancy between the acts charged in the indictment and those found by the jury. See *State v. Fitzgerald*, 308 Kan. 659, Syl., 423 P.3d 497 (2018). The district court granted that motion at sentencing, entering a judgment of acquittal on the aggravated sodomy charge.

The district court imposed a 246-month prison sentence for the rape offense, the high gridbox number for that crime based on Massey's criminal history. Massey appeals his conviction and sentence.

ANALYSIS

Massey raises five issues on appeal: (1) the admissibility of evidence of S.J.'s prior sexual conduct under K.S.A. 2019 Supp. 21-5502, (2) prosecutorial error from statements in closing arguments about the elements of rape by intoxication, (3) not providing a limiting instruction for K.S.A. 60-455 evidence, (4) cumulative error, and (5) whether using judicial findings to calculate criminal history violates section 5 of the Kansas Constitution Bill of Rights. This section addresses those claims in order, except for the first two. Those issues are flipped because the legal issue at the heart of the prosecutorial error claim affects the admissibility of the evidence of S.J.'s prior sexual conduct. With that in mind, we begin with prosecutorial error.

8

*The prosecutor did not err by telling the jury that capacity to consent was the key issue at trial.*

Massey argues that the prosecutor violated his right to a fair trial under the Due Process Clause by misstating the law in closing arguments. The prosecutor did so, Massey contends, by telling the jury that consent was irrelevant to the case. Massey says that these statements were prejudicial because they directed the jury to ignore his consent defense. The State counters that the prosecutor accurately stated the law: the jury had to decide whether S.J. could consent, not whether she did. And even if the prosecutor misstated the law, the State says that this error was harmless and does not require a new trial.

A two-step process governs Massey's claim: error and prejudice. The first step involves determining whether the prosecutor's conduct fell outside the wide latitude afforded to prosecutors in pursuing a criminal conviction. If it did, then step two asks whether the error affected the defendant's right to a fair trial. *State v. Anderson*, 308 Kan. 1251, 1260, 427 P.3d 847 (2018). At this step, the State must show "'beyond a reasonable doubt [that] the error did not affect the trial's outcome in light of the entire record, i.e., there is no reasonable possibility that the error contributed to the verdict.'" 308 Kan. at 1260.

At the first step, Massey claims that the prosecutor erred by misstating the law during closing arguments. If true, that constitutes error; prosecutors must accurately state the law to avoid diverting the jury from its duty to apply the controlling law to the facts. *Anderson*, 308 Kan. at 1261. The question, then, is whether the prosecutor's comments on Massey's consent defense misstated the law.

All the statements Massey cites make the same basic point: The prosecutor told the jury that it had to decide "whether [S.J.] was capable of giving consent, not whether

9

there was consent given." These statements were mostly made in response to Massey's consent defense in his closing arguments. The crux of that defense was that S.J. kissed him before the sexual encounter started. From that fact, Massey made two consent arguments: (1) that by kissing him, S.J. gave legally valid consent to the sexual acts that followed and (2) based on his understanding from their relationship that a kiss constituted consent, he did not know that S.J. had not consented. Neither argument is a legally appropriate defense to rape by intoxication under K.S.A. 2019 Supp. 21-5503(a)(2).

Massey's first consent argument ignores the statutory elements of that crime. Unlike subsection (a)(1), which criminalizes sex with a victim who "does not consent," subsection (a)(2) proscribes sex with a victim who is "incapable of giving consent because of the effect of any alcoholic liquor." K.S.A. 2019 Supp. 21-5503(a)(2). The State must prove, in other words, that the victim was "sufficiently intoxicated," "drunk enough to be unable to consent to sex." *State v. Chaney*, 269 Kan. 10, 20, 5 P.3d 492 (2000). Massey never argued that S.J. kissing him somehow showed that she was not so intoxicated she lacked the capacity to consent. Instead, this part of his consent argument was simply that S.J. "kissed him back and by their agreement that is consent." Evidence of conduct that could constitute S.J.'s valid consent when sober is not evidence that she was sober enough to give valid consent. The prosecutor rightly focused the jury's attention on S.J.'s condition and capacity to consent.

Massey's second consent argument—that he did not know S.J. had not consented—fares no better. The specific knowledge the defendant must possess to commit rape by intoxication is of the victim's "condition," meaning his or her "incapab[ility] of giving consent because of the effect of any alcoholic liquor." K.S.A. 2019 Supp. 21-5503(a)(2); *State v. Smith*, 39 Kan. App. 2d 204, 210-11, 178 P.3d 672 (2008). Massey does not explain why S.J. kissing him is evidence that he did not know or was not reasonably aware she was too drunk to consent to sexual activity.

10

Rather than dispute the plain meaning of subsection (a)(2), Massey contends it is effectively modified by subsection (e) of K.S.A. 2019 Supp. 21-5503:

> "Except as provided in subsection (a)(2), it shall not be a defense that the offender did not know or have reason to know that the victim did not consent to the sexual intercourse, that the victim was overcome by force or fear, or that the victim was unconscious or physically powerless." K.S.A. 2019 Supp. 21-5503(e).

Massey latches onto the introductory clause that precedes the list of prohibited knowledge defenses:  "[e]xcept as provided in subsection (a)(2)." As he reads it, that clause suggests that the listed defenses *are* defenses to rape under subsection (a)(2), meaning it *is* a defense to rape by intoxication that the offender had no knowledge that the victim did not consent.

This reading misconstrues subsection (e)'s function. The Legislature added the language now found in subsection (e) in 2010 along with the phrase "[k]nowingly engaging in" now found at the start of subsections (a)(1) and (a)(2). L. 2010, ch. 136, § 67; L. 2011, ch. 30, § 29. These changes were based upon the recommendations of the Kansas Criminal Code Recodification Commission in its report to the 2010 Legislature. In its official comments on the proposed revisions to the rape statute, the Commission noted that the "[k]nowingly engaging in" language simply "clarif[ies] that general intent is required." Kansas Criminal Code Recodification Commission:  2010 Final Report to the Kansas Legislature, Appx. A, p. 82.

In commenting on subsection (e), which was originally subsection (d) before later unrelated 2011 amendments, the Commission explained that it was "added to clarify that the offender need not know . . . that the victim did not consent, was overcome by force or fear, or was unconscious or physically powerless." Kansas Criminal Code Recodification Commission:  2010 Final Report to the Kansas Legislature, Appx. A, pp. 82-83. Thus,

11

rather than create a separate set of defenses to rape by intoxication (as Massey suggests), all it does is clarify that, *except for* subsection (a)(2), rape is a general intent crime. That is why the language listing prohibited defenses in subsection (e) is identical to the circumstances of rape under subsection (a)(1), and it makes *no* reference to incapability of consent "because of the effect of any alcoholic liquor, narcotic, drug or other substance." The introductory clause mentioning subsection (a)(2) exists because that offense is a combined general intent/specific intent crime: beyond the general knowledge required (knowingly engaging in sexual intercourse), the defendant must also know that the victim is too intoxicated to consent. *Smith*, 39 Kan. App. 2d at 210-11.

Read any other way, subsection (e) creates three new defenses to rape by intoxication that have nothing to do with that offense. If, as Massey suggests, the introductory clause in subsection (e) creates a defense to rape under subsection (a)(2) that the defendant did not know that the victim did not consent, by the same logic it would also recognize defenses for the other two circumstances. Surely it would for all the same reasons, even though those circumstances have just as little to do with the elements of rape by intoxication as the defendant's knowledge that the victim did not consent does. That cannot be right. Subsection (e), no more than subsection (a)(2), does not make Massey's consent claim valid. As the prosecutor repeated time and time again, the case was only about S.J.'s capacity to consent and Massey's knowledge of her condition.

Therefore, Massey's prosecutorial error claim fails at step one of the analysis. There is no error here that could have affected his right to a fair trial because the prosecutor's comments he complains of were a correct statement of the law—the issue for the jury was whether the effect of alcohol rendered S.J. incapable of consenting to sex, not whether S.J.'s conduct could have constituted consent if she had not been intoxicated. The prosecutor did not exceed the wide latitude afforded to the State in pursuing a criminal conviction, so Massey's claim falls short.

*The district court properly excluded irrelevant evidence of the victim's prior sexual conduct.*

Next, Massey argues that the district court erred in excluding testimony about S.J.'s prior sexual conduct. The testimony covered times in their relationship in which S.J. purportedly had sex with Massey while he slept. Massey contended that evidence was admissible under K.S.A. 2019 Supp. 21-5502, also known as the rape shield statute, because it supported his consent defense and undermined S.J.'s credibility. Excluding this evidence, Massey submits, affected his constitutional right to present a complete defense and to confront the witnesses against him. The State responds that the district court properly excluded the evidence as irrelevant and that the overwhelming evidence against Massey makes any error harmless.

*Admissibility*

Evidence of a rape victim's prior sexual conduct—even with the defendant—generally has no bearing on the victim's credibility or the issue of consent. *State v. Atkinson*, 276 Kan. 920, 926-27, 80 P.3d 1143 (2003). For that reason, such evidence is inadmissible unless it is "relevant and is not otherwise inadmissible." K.S.A. 2019 Supp. 21-5502(b). Like all evidence, evidence offered under the rape shield law is relevant if it is material and probative. *State v. Gilliland*, 294 Kan. 519, Syl. ¶¶ 8-9, 276 P.3d 165 (2012). Evidence is material if the fact it is offered to prove is both disputed and consequential, having "a legitimate and effective bearing on the decision." 294 Kan. 519, Syl. ¶ 9. And evidence is probative if it has any tendency to prove a material fact. 294 Kan. 519, Syl. ¶ 9. Appellate courts exercise unlimited review over whether evidence is material but review probativeness for abuse of discretion. *State v. Berriozabal*, 291 Kan. 568, Syl. ¶ 8, 243 P.3d 352 (2010). We will not second guess a district court's decision on the relevance of evidence about a victim's prior sexual conduct so long as "reasonable minds could disagree as to the court's decision." 291 Kan. 568, Syl. ¶ 12.

As we have noted, Massey moved to admit evidence that during his relationship with S.J., she had sex with him while he was asleep. He says that this evidence was relevant to his consent defense and S.J.'s credibility as a witness. We will address those issues in turn.

It is true that K.S.A. 2019 Supp. 21-5502 evidence may be relevant in some cases to whether the victim consented. See *Berriozabal*, 291 Kan. 568, Syl. ¶ 10. But as the last section explained, this is not one of those cases. The only consent question for the jury in a rape by intoxication case is whether, because of the effects of alcohol consumption, the victim could not give valid consent. Unless S.J.'s prior sexual conduct is probative of that issue—or of his knowledge of her condition—it is not relevant.

The prior acts Massey sought to admit were not probative of S.J.'s capacity to consent. Massey does not explain why prior instances in which S.J. initiated sex with Massey while he slept have any tendency to make it more or less likely that she was too intoxicated to consent on the morning the alleged rape occurred. Consider what kinds of information the jury would need to know to assess S.J.'s condition: the amount of alcohol she consumed and how quickly she did so, whether she drinks often, her height and weight, whether she ate before drinking, and how much time passed between her last drink and the alleged rape. This is by no means an exhaustive list, but it shows how far from relevant Massey's proffered evidence was of S.J.'s condition when the rape occurred. Whether S.J. had sex with Massey while he slept bore no logical relationship to her intoxication level on the morning of the alleged rape.

Nor were those acts probative of whether S.J.'s condition was "known by" or "reasonably apparent to" Massey. K.S.A. 2019 Supp. 21-5503(a)(2). Massey, in essence, argues that the prior sexual encounters informed his belief that S.J. consented—they showed that in their relationship, sex could occur even if only one partner was awake and participating. Again, the material issue under K.S.A. 2019 Supp. 21-5503(a)(2) is the

14

defendant's knowledge of the victim's incapacitated condition, not of whether he or she consented. And here too, Massey offers no reason that S.J. initiating sex with Massey while he slept has any tendency to make it more or less likely that he knew or that it should have been reasonably apparent to him that S.J. was too intoxicated to consent.

Massey additionally argues that the prior acts were relevant to S.J.'s credibility as a witness. Massey contends that the prior instances in which S.J. had sex with Massey while he slept would undermine S.J.'s testimony that consent in their relationship required both partners to be awake and participating. And because the evidence affects S.J.'s credibility, he says that it is admissible.

But the record reveals that Massey was not prevented from presenting that kind of credibility evidence. Remember that the district court's pretrial order only limited evidence of specific instances of prior sexual conduct between them; it allowed both S.J. and Massey to testify generally about "the prior understanding between [them]." Massey testified, for example, that he and S.J. "agree[d] to have sex with each other as long as there was a kiss initiating and it was reciprocated." That contradicted S.J.'s testimony that a kiss could only constitute consent in their relationship if both parties were awake and participating. Massey does not explain why evidence of specific instances were uniquely relevant when his testimony about how consent worked in their relationship already contradicted S.J.'s contrary statements. A reasonable person could agree with the district court that this was not a relevant issue.

One more point on relevance raised by Massey requires discussion. Massey invokes eight factors this court set out in *State v. Perez*, 26 Kan. App. 2d 777, Syl. ¶ 3, 995 P.2d 372 (1999), for assessing the relevance of evidence offered under K.S.A. 2019 Supp. 21-5502. The Kansas Supreme Court has also adopted those factors. *State v. Lackey*, 280 Kan. 190, Syl. ¶ 8, 120 P.3d 332 (2005), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006). But these factors only apply to assess the

15

evidence's relevance "to the issues of consent and credibility." *Lackey*, 280 Kan. 569, Syl. ¶ 8. Massey cites no case applying those factors in a rape by intoxication case. Again, *capacity* to consent is the touchstone of that crime. And even if these factors could apply, we agree with the State that most of them do not apply here.

In sum, the district court properly excluded evidence of S.J.'s prior sexual conduct under K.S.A. 2019 Supp. 21-5502. Massey's proffered evidence was not material to the actual issues at the trial. Reasonable minds could differ on whether the evidence Massey sought to admit was relevant, so the district court did not err in excluding the evidence.

*Harmless error*

Even if we would consider the prior acts to be relevant and thus admissible under K.S.A. 2019 Supp. 21-5502, excluding them does not automatically entitle Massey to a new trial. We must disregard nonprejudicial error; that is, error that does not affect the complaining party's substantial rights considering the entire record. *Gilliland*, 294 Kan. 519, Syl. ¶ 11. Error is nonprejudicial if, considering the entire record, it did not affect the trial outcome. 294 Kan. 519, Syl. ¶ 12.

How certain we must be that evidence is nonprejudicial depends on whether the error affected constitutional rights. If it did, then the party benefiting from the error must show beyond a reasonable doubt that the error did not affect the trial record, meaning "there is no reasonable possibility that the error affected the verdict." 294 Kan. 519, Syl. ¶ 13. But if the error did not affect constitutional rights, the party benefiting from the error need only show that there is a "reasonable probability that the error will not or did not affect the outcome of the trial in light of the entire record." 294 Kan. 519, Syl. ¶ 13.

Massey cannot show reversible error under either standard. His contrary argument rests on a misplaced notion that the case came down to who the jury believed about the

nature of consent in their relationship. It did not. It came down to S.J.'s intoxicated condition and Massey's knowledge of that condition. And on that score, the evidence was overwhelming. The State presented undisputed evidence about how much S.J. had to drink the night before and Massey's awareness of that fact. Massey admitted that he had sex with S.J. just several hours after watching her vomit and blackout from excessive alcohol consumption. From this evidence we conclude there is no chance the jury would have returned a different verdict had it known that S.J. in the past had sex with Massey while he slept. Thus, any error in excluding evidence under the rape shield statute was harmless.

*Not giving a limiting instruction for prior crimes evidence was not clearly erroneous.*

In Massey's third issue on appeal, he argues that the district court should have provided a limiting instruction for prior crimes evidence admitted under K.S.A. 2019 Supp. 60-455. Had the jury been instructed on how to consider that evidence, Massey insists it would not have convicted him. The State agrees that the district court should have provided a limiting instruction for the statements Massey cites but says that the failure to do so was harmless.

Under K.S.A. 2019 Supp. 60-455(a) and (b), evidence that a person committed prior "crime[s] or civil wrong[s]" is inadmissible unless it is relevant to prove a material fact. To avoid error when admitting such evidence, "the district judge must give a limiting instruction informing the jury of the specific purpose for admission." *State v. Gunby*, 282 Kan. 39, Syl. ¶ 3, 144 P.3d 647 (2006). However, not providing a limiting instruction does not invariably constitute reversible error. 282 Kan. 39, Syl. ¶ 3. That is especially true if, as here, a party does not request a limiting instruction below. In that situation, we reverse for a new trial only if not providing an instruction was clearly erroneous. See K.S.A. 2019 Supp. 22-3414(3); *State v. Gentry*, 310 Kan. 715, 720-21, 449 P.3d 429 (2019). To show clear error, Massey must firmly convince us that,

17

considering the entire trial record de novo, "'the jury would have reached a different verdict had the instruction error not occurred.'" 310 Kan. at 721.

The parties march straight to applying that standard without first asking whether all the evidence Massey cites even comes within K.S.A. 60-455's ambit. That statute excludes evidence that a person committed "a crime or civil wrong on a specified occasion." K.S.A. 2019 Supp. 60-455(a). Evidence would fall outside K.S.A. 60-455's scope and thus require no limiting instruction if it "did not establish that [the defendant] committed a particular crime or civil wrong on a particular occasion." *State v. Robinson*, 303 Kan. 11, 238, 363 P.3d 875 (2015), *disapproved of on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017).

Massey complains of five instances covered by the rules under K.S.A. 2019 Supp. 60-455. Only two statements Massey cites arguably fit the description under *Robinson*— S.J.'s two references to the police escorting her back to Massey's house. But unlike the other statements Massey cites, those comments were not evidence that Massey committed a particular crime or civil wrong. So they did not trigger K.S.A. 60-455 and no limiting instruction was required for them.

That leaves three statements that Massey says required a limiting instruction, all of which relate to Massey's violent behavior when drinking alcohol. First, S.J. testified that Massey "liked to drink and he got violent a lot when he was drinking." Second, S.J. explained that she drank so much that night because she knew that "when [Massey] drinks he gets really violent and oftentimes wants to get physically violent and choke me and throw me on the floor. . . . So I drank that much to prevent him from hurting me." And last, sexual assault nurse Thomas repeated a similar comment S.J. made during the forensic exam, that she drank to stop Massey from doing so because "she knew what kind of manners, what [Massey] was like when he was drunk." Those three statements are evidence of a crime or civil wrong, thus triggering K.S.A. 60-455's limiting instruction

18

requirement. The only issue left, then, is whether Massey has shown that not instructing the jury on how to view that evidence was clearly erroneous.

We conclude that Massey has failed to do so. The three statements about Massey being violent when drinking were fleeting; in all, they occupied a mere 12 double-spaced lines in the trial transcript—less than half a page. They were dwarfed by overwhelming evidence on the key issues of whether S.J. was too intoxicated to consent to sexual activity and Massey's knowledge of her condition. The evidence showed that S.J. chugged some two-thirds of a large bottle of whiskey in the hour before dinner, becoming so intoxicated she vomited and blacked out. Knowing these facts, and that S.J. had told him before the drinking started that she did not want to have sex with him that night, Massey still had sex with S.J. He did so based on his understanding that during their now ended relationship a reciprocated kiss constituted consent to sexual activity, even if one partner was not awake. He did so despite observing that S.J.'s eyes were closed, her body was not moving, and she snored during the act. Considering the strength of the State's case against Massey and the passing nature of the comments complained of, the prior acts evidence likely had little to no effect on the jury's verdict. For that reason, Massey has not shown that the failure to instruct the jury on how to evaluate that evidence was clearly erroneous.

*There is no cumulative error.*

Massey next argues that even if no single error at his trial was prejudicial, the cumulative effect of these errors requires reversal. In reviewing a cumulative error claim, this court reviews the entire record and exercises unlimited review. *State v. Sean*, 306 Kan. 963, Syl. ¶ 21, 399 P.3d 168 (2017). "One error is insufficient to support reversal under the cumulative error doctrine." 306 Kan. 963, Syl. ¶ 21. As explained above, the only trial error here was not instructing the jury on prior crimes evidence under K.S.A. 2019 Supp. 60-455. Thus, cumulative error does not apply here.

*Section 5 of the Kansas Constitution Bill of Rights provides Massey no right to have a jury establish his criminal history.*

Finally, Massey raises a constitutional challenge to a sentencing statute allowing judges to determine a defendant's prior criminal history. See K.S.A. 2019 Supp. 21-6814(a). He says that under section 5 of the Kansas Constitution Bill of Rights only juries may find the facts establishing any prior convictions because that was the accepted practice in Kansas at statehood. To remedy this constitutional violation, he submits that this court must vacate his sentence and remand for resentencing.

Massey acknowledges that he did not raise this constitutional challenge below. A party generally cannot raise a constitutional claim for the first time on appeal. *State v. Godfrey*, 301 Kan. 1041, Syl., 350 P.3d 1068 (2015). That rule has exceptions, though, including when consideration of the new claim is needed to secure fundamental rights. 301 Kan. at 1043. The jury trial right secured by section 5 is a fundamental one. *State v. Love*, 305 Kan. 716, 734, 387 P.3d 820 (2017). Since Massey's claim implicates that right, this court may consider it even though he did not raise it below. *State v. Albano*, 58 Kan. App. 2d 117, 125, 464 P.3d 332 (2020), *rev. granted* 312 Kan. __ (September 30, 2020).

The framework for evaluating Massey's claim is well known. Section 5, which provides that "[t]he right of trial by jury shall be inviolate," preserves the jury trial right as it existed at common law when Kansas adopted its constitution. *Love*, 305 Kan. at 734. Massey maintains that Kansas at statehood followed a common-law practice of having juries decide criminal history, and so the sentencing guidelines violate section 5 by allowing judges to decide that issue. Whether a sentencing statute violates section 5 is a legal question subject to unlimited appellate review. *Albano*, 58 Kan. App. 2d at 125.

Massey is by no means the first person to suggest that judicial criminal history findings violate section 5. A panel of our court discussed those reasons at length in *Albano*. That panel rejected a carbon copy of Massey's section 5 claim for two reasons: (1) The federal Constitution does not require jury findings for criminal history, and no caselaw supported a broader interpretation of section 5's jury trial right and (2) section 5 could not receive a broader interpretation because juries did not decide prior convictions at common law when Kansas adopted its Constitution. 58 Kan. App. 2d at 126.

Those reasons apply with equal force here. Massey argues the same points raised in *Albano* almost word for word, citing the same cases to show that juries decided criminal history at statehood. *Albano* spent nine pages distinguishing those cases and thoroughly responding to every aspect of Massey's argument. See 58 Kan. App. 2d at 125-34. Rather than repeat those responses here, we simply note our agreement with *Albano*'s persuasive analysis. Although not bound to do so, we choose to follow *Albano*'s sound reasons for rejecting Massey's claim. See *State v. Fleming*, 308 Kan. 689, 706, 423 P.3d 506 (2018) ("[O]ne panel of the Court of Appeals may disagree with a previous panel of the same court.").

Affirmed.